UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10 - CV- 23968 -UNGARO

MARIO DIAZ-BALART and CORRINE
BROWN,

  Plaintiffs,

and

THE FLORIDA HOUSE OF
REPRESENTATIVES,

  Plaintiff-Intervenor,

vs.

KURT BROWNING, in his official capacity as
Secretary of State of the State of Florida,

  Defendant,

and

FLORIDA STATE CONFERENCE OF
NAACP BRANCHES, *et al*.,

  Intervening Defendants.

_____

**PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT
MOTION FOR SUMMARY FINAL JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW**

  Plaintiffs MARIO DIAZ-BALART and CORRINE BROWN, and Plaintiff-Intervenor

THE FLORIDA HOUSE OF REPRESENTATIVES, by and through their respective

undersigned counsel, in accordance with Federal Rule of Civil Procedure 56 and Local Rule

7.5(a), jointly move for entry of a summary final judgment.

  Summary judgment is proper where, as here, pleadings and other matters on file show

"there is no genuine issue as to any material fact and that the moving party is entitled to

*Diaz-Balart, et al. v. Browning, et al.*
Case No. 10 - 23968 - UNGARO

judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed.

R. Civ. P. 56(c)). There are no material contested facts here, and Plaintiffs are entitled to a final

judgment.[1]

## I.     INTRODUCTION AND BACKGROUND.

Article I, Section 4 of the United States Constitution—appropriately known as the

Elections Clause—provides that the "Times, Places and Manner of holding Elections for

Senators and Representatives, shall be prescribed in each State *by the Legislature* thereof,"

subject to the authority of the United States Congress to override or supplement such laws. This

duty includes the authority to draw congressional districts. While the Supreme Court has

recognized that States may exercise this legislative prerogative in different ways, it has upheld

election measures only when passed "as *part* of the legislative process." *Smiley v. Holm*, 285

U.S. 355, 371 (1932) (emphasis added); *see also Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565,

569 (1916).

This case involves a challenge to the constitutionality of substantive rules limiting the

exercise of the Florida Legislature's authority under the Elections Clause to draw congressional

districts. The rules at issue were adopted wholly *outside* of the state legislative process pursuant

to an initiative opposed by the Legislature. The question presented here is whether the United

States Constitution permits the imposition of substantive rules governing federal elections

through measures enacted beyond the legislative process—and over the Legislature's objection.

As explained below, existing Supreme Court precedent, lower court decisions, and significant

historical materials overwhelmingly lead to the conclusion that this question must be answered in

the negative—and that the substantive rules at issue are invalid. Any other conclusion would

---

[1] Consistent with Local Rule 7.5(c), Plaintiffs simultaneously submit their statement of undisputed facts.

contravene binding precedent and strip the Constitution's reference to "the Legislature thereof" of any meaning.

### A.     The Legislative Power Under Florida's Constitution.

The Florida Constitution provides that "[t]he legislative power of the state shall be vested in a legislature of the State of Florida, consisting of a senate composed of one senator elected from each senatorial district and a house of representatives composed of one member elected from each representative district."  Fla. Const. art. III, § 1.  The Constitution also sets forth a process governing "laws" and the "passage of bills," which, among other things, subjects bills to executive approval and potential veto. *Id.* §§ 6-8.

### B.     The Amendments to Florida's Constitution.

The Florida Constitution separately reserves to the people "[t]he power to propose the revision or amendment of any portion or portions of [the] constitution."  Fla. Const. art. XI, § 3. Once a sponsor obtains sufficient petition signatures, its proposed amendment is submitted to a vote. *Id.* art. XI, § 5.  The lone state limitation on this power is that the amendment shall "embrace but one subject and matter directly connected therewith."  *Id.* art. XI, § 3.

Through this process, a political organization proposed ballot initiatives known as "Amendments Five and Six," which seek to impose "standards for establishing" state and congressional districts.  The Florida Legislature opposed the amendments, *see, e.g.*, *Roberts v. Brown*, 43 So. 3d 673, 676 (Fla. 2010); *Advisory Op. to Att'y Gen. re Standards for Establishing Legis. Dist. Boundaries*, 2 So. 3d 175, 181 (Fla. 2009), but both Amendments nevertheless passed on November 4, 2010.  They subsequently became Sections 20 and 21 of Article III of the Florida Constitution and, pursuant to Article XI, Section 5(e), Florida Constitution, became effective January 4, 2011.  Aside from governing state and congressional districts, respectively, Amendments Five and Six are substantively identical.

Amendments Five and Six impose conflicting and broadly worded limitations on districting, including that "no apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent"; that "districts shall be compact"; that "districts shall, where feasible, utilize existing political and geographical boundaries"; and that "districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice."  Fla. Const. art. III, §§ 20, 21.

With respect to *state* redistricting, Amendment Five adds to substantial regulation already in the Florida Constitution.  As has long been the case, the Legislature establishes state districts by joint resolution, free from any gubernatorial veto.  *Id.* § 16(a).  Districts must be distinct, identical, or overlapping, *id.*, and consist of contiguous territory, *see In re Apportionment Law,* 414 So. 2d 1040, 1051 (Fla. 1982).  The Legislature must act "at its regular session in the second year following each decennial census," Fla. Const. art. III, §16(a), after which its districting plan is submitted to the Florida Supreme Court for expedited review, *id.* § 16(c).  If the Court rejects the plan, the Legislature must reconvene and revise its plan.  *Id.* § 16(d).  If still unsuccessful, the Florida Supreme Court ultimately draws the state districts.  *Id.* § 16(f).

Congressional redistricting, on the other hand, is quite different.  From the beginning of Florida's statehood until Amendment Six's adoption, the Florida Constitution never attempted to restrict or otherwise govern the Legislature's exercise of its *congressional* redistricting duty.  Instead, the Legislature established congressional districts pursuant to its ordinary legislative processes, which were subject to—among other things—a gubernatorial veto.  *See* Fla. Const. art. III, §§ 1, 8; *see also* § 8.0002, Fla. Stat. (statute establishing current congressional districts).

Thus, although the amendments appear at first glance to embrace similar changes to state

*Diaz-Balart, et al. v. Browning, et al.*
*Case No.* 10 - 23968 - UNGARO

and congressional redistricting, they represent markedly different—and constitutionally distinct—amendments to Florida's organic law.  Amendment Five modifies the long-existing process under which the Legislature draws state districts created by the Florida Constitution. Amendment Six, by contrast, would govern the Legislature's *federal* obligation to create *federal* districts, an obligation owing its existence to the United States Constitution.  This case involves a challenge to the constitutionality of Amendment Six only—which governs congressional redistricting—not to Amendment Five's restrictions on drawing *state* districts.

## II.   THE COURT HAS JURISDICTION TO CONSIDER THIS CLAIM.

The Secretary of State has raised several jurisdictional defenses, (DE 62 at 4), but none has merit.  First, Plaintiffs have standing to present this claim because they satisfy the familiar elements of injury in fact, causation, and redressability.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  It is well settled that as long as one plaintiff has standing, the Court has jurisdiction.  *See Mass. v. Envtl. Prot. Agency*, 549 U.S. 497, 518 (2007); *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 330 (1999).  Here, each Plaintiff has standing.

The Florida House of Representatives faces a "concrete and particularized" injury, *Lance v. Coffman*, 549 U.S. 437, 442 (2007), flowing directly from Amendment Six—an invasion of its federal constitutional power and duty to draw congressional districts.[2]  Plaintiffs Brown and

---

[2] Moreover, the Florida House of Representatives has been authorized to prosecute this suit, *see* Florida House of Representatives Rule 2.6 ("The Speaker may initiate, defend, intervene in, or otherwise participate in any suit on behalf of the House . . . when the Speaker determines that such suit is of significant interest to the House."), and a legislative body has standing to bring a duly authorized suit asserting institutional injury, *see, e.g.*, *Sixty-Seventh Minnesota State Senate v. Beens*, 406 U.S. 187, 193-94 (1972); *United States v. American Tel. & Tel. Co.*, 551 F.2d 384, 391 (D.C. Cir. 1976); *Committee on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 69-70 (D.D.C. 2008); *U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 89 (D.D.C. 1998), *appeal dismissed*, 525 U.S. 316 (1999).

Diaz-Balart also have standing because they face concrete and particularized injury as members of Congress whose districts (like all Florida congressional districts) will be redrawn pursuant to Amendment Six's unconstitutional mandates.  (*See* DE 36-1 at ¶¶ 5-6.)  These threats are imminent:  Amendment Six became law in January 2011, the redistricting process has begun, and it will be complete in early 2012.[3]  Last, Plaintiffs easily satisfy the causation and redressability requirements.  Amendment Six is the cause of Plaintiffs' threatened injury, and this Court's declaration of its unconstitutionality would protect Plaintiffs from that harm.[4]

The Secretary's other jurisdictional objections likewise fail.  The claim is obviously ripe, and there is no threat of "premature adjudication."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99 (1977).  The test for ripeness considers "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Id.* at 149.  Amendment Six is already law in Florida.  The redistricting process has begun and will be completed in less than a year.  The legislative session for redistricting will begin in January, 2012, *see* Ch. 2010-91, § 1, Laws of Fla., and Plaintiffs have a compelling need for a decision before the process concludes.  And the assertion that this case presents a non-justiciable political question is refuted by existing Supreme Court precedent.  *See Smiley v. Holm*, 285 U.S. 355, 369 (1932) (adjudicating Elections Clause claim); *see also*

---

[3] Both legislative chambers already have formed redistricting committees, employed staff, received 2010 Census data, and scheduled hearings.  *See generally* Florida Redistricting, *available at* http://www.floridaredistricting.com and Senate Committee on Reapportionment *available at* http://www.flsenate.gov/Committees/Show/RE/.

[4] Florida's Secretary of State is the "chief election officer of the state" and is responsible for supervising election laws.  §§ 97.012, 101.58, Fla. Stat.  In this capacity, the Secretary has been a defendant in several federal cases involving districting.  *See, e.g., Davis v. Chiles*, 139 F.3d 1414 (11th Cir. 1998); *Martinez v. Bush*, 234 F. Supp. 2d 1275, 1278 (S.D. Fla. 2002) (three-judge court).  In addition, the Secretary of State is the custodian of the Florida Constitution, § 15.01, Fla. Stat., making him a proper state defendant.  *See Florida House of Representatives v. Martinez*, 555 So. 2d 839, 846 (Fla. 1990) (ordering Secretary of State to expunge improper vetoes from state's official records).

*Lance v. Dennis*, 546 U.S. 459, 467 (2006) (per curiam) (vacating district court's *Rooker-Feldman* judgment and remanding for consideration of Elections Clause claim, with no indication claims were barred by the political-question doctrine).  Accordingly, this Court has jurisdiction to consider the merits.

III.    **AMENDMENT SIX IS INVALID BECAUSE IT SEEKS TO REGULATE FEDERAL ELECTIONS OUTSIDE OF THE LEGISLATIVE PROCESS.**

States' authority to regulate federal elections—including drawing congressional districts—flows directly from the federal constitution's narrow delegation of authority in the Elections Clause.  Amendment Six was enacted wholly outside the legislative process and thus beyond that limited federal delegation.  It is therefore invalid.

A.    **The Federal Elections Clause Is The Exclusive Source of State Authority to Establish Congressional Districts.**

It is well established that states have no inherent authority to govern congressional elections.  "Because any state authority to regulate election to [federal] offices could not precede their very creation by the Constitution, such power had to be delegated to, rather than reserved by, the States."  *Cook v. Gralike*, 531 U.S. 510, 522 (2001) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804 (1995)) (marks omitted).  "[A]s the Framers recognized, electing representatives to the National Legislature was a new right, arising from the Constitution itself."  *U.S. Term Limits,* 514 U.S. at 805.  The States may therefore regulate congressional elections "only within the exclusive delegation of power under the Elections Clause," *Cook*, 531 U.S. at 523, and, thus, subject only to the terms of that delegation.  *See* Joseph Story, 1 Commentaries on the Constitution of the United States § 627 (3d ed. 1858) ("[T]he states can exercise no powers whatsoever, which exclusively spring out of the existence of the national government,

*Diaz-Balart, et al. v. Browning, et al.*
Case No. 10 - 23968 - UNGARO

which the constitution did not delegate to them . . . .").[5]

The Elections Clause authorizes States to establish the "procedure and safeguards" for congressional elections. *Smiley*, 285 U.S. at 366. And the drawing of congressional districts is included in this Elections Clause duty. *See, e.g., Branch*, 538 U.S. at 266 (2003); *Smiley*, 285 U.S. at 365 (1932); *Smith v. Clark*, 189 F. Supp. 2d 548, 550 (S.D. Miss. 2002) ("No case—or any other authority—has ever expressed doubt that [the Elections Clause] applies to congressional redistricting."). Thus, like all regulation of federal elections, states' congressional redistricting is limited by the Elections Clause. *See Cook*, 531 U.S. at 522-23 ("No other constitutional provision gives the States authority over congressional elections . . . ."). And as noted, the Elections Clause by its terms states that elections measures within the scope of the Clause "shall be prescribed in each State *by the Legislature thereof*."

### B.   The Elections Clause Duty Is Explicitly Assigned To The State's Legislative Power and Not to States Generally.

The Framer's use of "Legislature" was not casual or accidental. The term was "not one 'of uncertain meaning when incorporated into the Constitution. What it meant when adopted it still means for the purpose of interpretation. A Legislature was then the representative body which made the laws of the people.'" *Smiley*, 285 U.S. at 365 (quoting *Hawke v. Smith*, 253 U.S. 221, 227 (1920)). The Framers deliberately referred to "States" in some provisions. *See, e.g.*,

---

[5] Importantly, the Elections Clause is more than a grant of permission; it imposes on state legislatures an affirmative *duty* to act. *See* U.S. Const. art I, § 4 (manner of elections "*shall* be prescribed . . . by the Legislature") (emphasis added); *Branch v. Smith*, 538 U.S. 254, 279-80 (2003) (plurality) (describing "the state legislature's *obligation* to prescribe the 'Times, Places and Manner' of holding congressional elections") (emphasis added); *Foster v. Love*, 522 U.S. 67, 69 (1997) (Elections Clause "invests the States with *responsibility* for the mechanics of congressional elections"); *U.S. Term Limits*, 514 U.S. at 804-05 ("[T]he context of federal elections provides one of the few areas in which the Constitution expressly requires action by the States, namely that [the times, places, and manner] shall be prescribed in each State by the Legislature thereof.") (marks omitted).

U.S. Const. art. I, § 8 (reserving "to the States respectively, the Appointment of the Officers, and the Authority of training the Militia"); *id.* art. I, § 10 (detailing actions "[n]o state shall" take absent congressional approval); *id.* amend. X (reserving non-delegated powers "to the States respectively, or to the people"). In others, it granted authority directly to the people. *See, e.g.,* U.S. Const. art. I, § 2 (House "shall be composed of Members chosen every second year *by the People of the several States*") (emphasis added). "But there are a few exceptional cases in which the Constitution imposes a duty or confers a power on a particular branch of the State's government," *Bush v. Gore*, 531 U.S. 98, 112 (2000) (Rehnquist, C.J., concurring), and the Elections Clause is one of them.

In *Smiley v. Holm*, the United States Supreme Court considered whether a state's gubernatorial veto applied to the state legislature's congressional districting plan. 285 U.S. at 361-62. After analyzing the Elections Clause's language and context, the Court concluded that the authority it confers "is that of making laws" and that the term "Legislature" in the Elections Clause thus necessarily refers to the State's legislative process. *Id.* at 366. "As the authority is conferred for the purpose of making laws for the state, it follows, in the absence of an indication of a contrary intent, that the exercise of the authority must be in accordance with the method which the state has prescribed for *legislative enactments*." *Id.* at 367 (emphasis added). In upholding the veto, the Court emphasized that the State's own constitution made clear that the gubernatorial veto was "*part* of the legislative process." *Id.* at 369 (emphasis added).[6]

Likewise, in *Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565 (1916), the Supreme Court earlier upheld Ohio's referendum invalidating the legislature's redistricting plan. The Ohio

---

[6] The Supreme Court further observed that "there is nothing in article 1, s 4, which precludes a state from providing that legislative action in districting the state for congressional elections shall be subject to the veto power of the Governor *as in other cases of the exercise of the lawmaking power*." *Id.* at 372-73 (emphasis added).

*Diaz-Balart, et al. v. Browning, et al.*
*Case No.* 10 - 23968 - UNGARO

Constitution allowed not only for a gubernatorial veto, but also for a referendum "to approve or disapprove by popular vote *any law* enacted by the general assembly." *Id.* at 566 (emphasis added).  Following a citizen petition under that referendum provision, the electors rejected the districting plan.  *Id.*  Challengers filed suit, contending that the referendum process violated the Elections Clause.  *Id.* at 566-67.  The Supreme Court rejected that argument, explaining that the State's referendum mechanism at issue "was treated as *part of* the legislative power." *Id.* at 569 (emphasis added).  Indeed, as the Court emphasized, the State Constitution "expressly declared" that the legislative power was "vested not only in the senate and house of representatives of the state, constituting the general assembly, but in *the people,* in whom a right was reserved by way of referendum to approve or disapprove by popular vote any law enacted by the general assembly." *Id.* at 566 (emphasis added).  In other words, as the Court subsequently explained in *Smiley,* the State had made "the referendum in establishing congressional districts . . . *a part of* the legislative process."  285 U.S. at 371 (emphasis added); *see also id.* (under the state constitution, "the referendum was treated as part of the legislative power, the power as thus constituted should be held and treated to be the state legislative power for the purpose of creating congressional districts").

Moreover, the veto provisions at issue in *Smiley* and *Hildenbrant* did not subject the legislature's apportionment decisions to new substantive rules.  Rather, they simply operated as a means of preventing congressional districts from taking effect, essentially wiping the slate clean and requiring the *legislatures* to start over and draw new district lines.  *See Hildebrant,* 241 U.S. at 566 (referendum provision put to the people the "question of whether the law should become operative"; if "not approved," the law "should have no effect"); *Smiley*, 285 U.S. at 363.  Thus, even when these veto measures were exercised, the legislature still had the ultimate

responsibility to draw congressional districts as it saw fit (subject to the possibility of a veto).

**C.      Amendment Six Conflicts With *Smiley* and *Hildebrant* Because It Was Enacted Completely Outside the Legislative Process.**

*Smiley* and *Hildebrant* establish that the Constitution's use of "Legislature" in the Elections Clause must be given effect and that, accordingly, the Elections Clause authorizes only those measures that are adopted as *part of* the legislative process.  *See Smith*, 189 F. Supp. 2d at 553 ("*Smiley* indicates that congressional redistricting must be done by a state in the same manner that other legislative enactments are implemented."); *see also Lance*, 549 U.S. at 442 (referring to *Smiley* and *Hildebrant* as "[o]ur two decisions construing the term 'Legislature' in the Elections Clause"); *Smith*, 189 F. Supp. 2d at  551 (three-judge court) (analyzing *Smiley* and *Hildebrant* and noting that "[o]nly a few cases have construed [the term 'legislature' in Article I, Section 4]").  *Cf. Salazar v. Davidson*, 79 P.3d 1221, 1232 (Colo. 2003) (concluding that Elections Clause encompasses court-drawn redistricting plans).[7]  Amendment Six nevertheless was enacted and seeks to regulate congressional elections wholly *outside* the legislative process.

Under the Florida Constitution—both before and after Amendment Six—the State's

---

[7] The Supreme Court denied *certiorari* review in *Salazar*.  Three Justices—Chief Justice Rehnquist, Justice Scalia, and Justice Thomas—dissented from the denial of *certiorari*.  *Colo. Gen. Assembly v. Salazar*, 541 U.S. 1093 (2004) (Rehnquist, C.J., dissenting).  They believed that the Elections Clause dictated a different result on the merits:

> Generally the separation of powers among branches of a State's government raises no federal constitutional questions, subject to the requirement that the government be republican in character.  But the words "shall be prescribed in each State by the Legislature thereof" operate as a limitation on the State.  And to be consistent with Article I, § 4, there must be some limit on the State's ability to define lawmaking by excluding the legislature itself in favor of the courts.

*Id.* at 1095.  In any event, whatever arguable authority that the federal courts may have to draw congressional districts when a state legislature simply fails to act, such authority would not extend to a measure—like Amendment Six—that seeks up front to impose substantive requirements on the Legislature's authority to draw congressional districts and that was enacted wholly outside the legislative process.

legislative power is defined in Article III: "The legislative power of the state shall be vested in a legislature of the State of Florida, consisting of a senate composed of one senator elected from each senatorial district and a house of representatives composed of one member elected from each representative district." Fla. Const. art. III, § 1. Bills passed by the Legislature are subject to gubernatorial veto, which is subject to legislative override. *Id.* art. III, § 8.[8]

The citizen initiative power, on the other hand, resides in Article XI of the Florida Constitution, which governs constitutional amendments. "The power to propose the revision or amendment *of any portion or portions of this constitution* by initiative is reserved to the people . . . ." *Id.* art. XI, § 3 (emphasis added). The Constitution also permits amendments proposed by three-fifths of the Legislature, by periodic constitutional revision commissions, through constitutional conventions, or by a taxation and budget reform commission. *Id.* art. XI, §§ 1, 2, 4, 6. But an amendment to the Constitution is not an exercise of the State's *legislative* authority; to the contrary, it is the result of a process that is wholly distinct from any such exercise. *See In re Advisory Op. to Atty. Gen. ex rel. Limiting Cruel & Inhumane Confinement of Pigs*, 815 So. 2d 597, 601 (Fla. 2002) (Pariente, J., concurring) ("[S]ome of Florida's most crucial legal principles have evolved as a result of the initiative process. *However, the legislative power of the state is vested in the Legislature* . . . .") (emphasis added) (quoting *Advisory Op. to the Atty. Gen.—Limited Marine Net Fishing*, 620 So. 2d 997, 1000 (Fla. 1993)).

This case is therefore completely different from *Hildebrant.* Unlike *Hildebrant,* there is no provision of the Florida Constitution purporting to vest the "legislative power . . . *in the*

---

[8] The gubernatorial veto is hardly a unique feature of legislative authority. It is indeed part of the federal legislative power, U.S. Const. art I, § 7, and it was present in more than one state at the time of ratification, *Smiley*, 285 U.S. at 368 ("[T]he restriction which existed in the case of these states was well known."). It has been part of Florida's legislative process since the beginning. *See* Fla. Const. art. III, § 16 (1838).

*Diaz-Balart, et al. v. Browning, et al.*
*Case No.* 10 - 23968 - UNGARO

*people,*" much less any provision reserving a right on behalf of the people "by way of referendum to approve or disapprove by popular vote any law enacted by the general assembly." *Hildebrant*, 241 U.S. at 566.   Likewise, the gubernatorial veto at issue in *Smiley* was plainly part of the "legislative process," *Smiley*, 285 U.S. at 368, as it is in Florida, Fla. Const. art. III, § 8. "Whether the Governor of the state, through the veto power, shall have a part in the making of state laws, is a matter of state polity." *Smiley*, 285 U.S. at 368.  The Elections Clause "neither requires nor excludes such participation." *Id.*  The citizen-initiative process that produced Amendment Six, however, exists wholly outside of the legislative power under the Florida Constitution.

To the extent that a State may amend its constitution to extend legislative authority to a separate initiative process, Florida certainly has never done so.  In fact, before 1968, the Florida Constitution included no citizen initiative process at all.  *Evans v. Firestone*, 457 So. 2d 1351, 1358 (Fla. 1984) (Ehrlich, J., concurring).  But even after the people, through the 1968 constitution, adopted the initiative process, they left all legislative authority exclusively with the Legislature.  That decision had substantial practical effects because of the fundamental differences between the legislative and initiative processes.  The legislative process involves substantial debate, compromise, transparency, and citizen involvement.  "[A]ny proposed law must proceed through legislative debate and public hearing.  Such a process allows change in the content of any law before its adoption." *Fine v. Firestone*, 448 So. 2d 984, 989 (Fla. 1984).  This contrasts sharply with the initiative amendment process, in which "[n]o official record of legislative history or debate [is] available." *Id.*  Indeed, electors vote on initiatives relying on a limited ballot title and summary (limited to fifteen and seventy-five words, respectively). § 101.161, Fla. Stat.  The Florida Supreme Court has therefore acknowledged that the title and

summary "need not explain every ramification of a proposed amendment, only the chief

purpose." *Advisory Op. to the Attorney General re Extending Existing Sales Tax*, 953 So. 2d

471, 482 (Fla. 2007) (marks omitted). Given the substantial differences between legislative

authority and constitutional amendment authority, it is no surprise that the Florida Constitution

treats them differently—committing the legislative authority to the Legislature exclusively and

not extending it to the limited initiative process. And that assignment of authority must be given

effect for purposes of the Elections Clause. *Cf. Cal. Democratic Party v. Jones*, 530 U.S. 567,

602 (2000) (Stevens, J., dissenting) ("[T]he text of the Elections Clause suggests that . . . an

initiative system, in which popular choices regarding the manner of state elections are

unreviewable by independent legislative action, may not be a valid method of exercising the

power that the Clause vests in state 'Legislatures.'").

Upholding Amendment Six as a valid exercise of the authority delegated to the State of

Florida under the Elections Clause not only would conflict with Supreme Court precedent

interpreting that Clause, but would also remove all meaning from that Clause's use of "by the

*Legislature* thereof" and permit potentially limitless regulation of federal elections beyond the

legislative process and the checks and protections inherent in that process.[9]

---

[9] Plaintiffs acknowledge that other state constitutions have sought to regulate congressional redistricting. *See, e.g.*, Ariz. Const. art. IV, pt. 2, § 1; Cal. Const. art. XXI, §2; Haw. Const. art. IV, § 2; Idaho Const. art. III, § 2. However, none of these provisions has been affirmed against an Elections Clause challenge, and the constitutionality of such provisions must be assessed in light of (among other things) whether they were enacted as part of the *legislative* process. Regardless, existing practice does not excuse constitutional violations, and courts do not permit the passage of time and longstanding contrary practice to overrule the Framers' intent. For example, for decades, states regularly created grossly disproportionate legislative districts, in violation of the federal constitution. *See, e.g., Reynolds v. Sims*, 377 U.S. 533, 570, 582 (1964). Yet the Supreme Court ended this unconstitutional practice notwithstanding the dissent's concern that doing so would invalidate the work of dozens of state legislatures. *Id.* at 589 (Harlan, J., dissenting). Last, it is telling that many of the state constitutional provisions imposing redistricting standards—like Florida's constitution until Amendment Six—are

*Diaz-Balart, et al. v. Browning, et al.*
*Case No.* 10 - 23968 - UNGARO

### D.   Other Authorities Further Demonstrate Amendment Six's Invalidity.

Although the text of the Constitution and its interpretation in *Smiley* and *Hildebrant*

provide ample justification for invalidating Amendment Six, other authorities further

demonstrate the point.  First, several state courts have recognized that the Elections Clause grant

of authority remains limited to the legislative process.  In *Dummit v. O'Connell*, 181 S.W.2d 691

(Ky. 1944), the state appellate court affirmed a statute permitting federal absentee voting, despite

a constitutional provision requiring in-person voting.  While *Smiley* required the legislature to

"function in the method prescribed by the State Constitution in directing the times, places, and

manner of holding elections for senators and representatives in Congress, since in so doing it is

exercising the function of lawmaking," the court rejected the position that "the scope of its

enactment on the indicated subjects is also limited by the provisions of the State Constitution."

*Id*. at 694.  Because a state constitution cannot limit legislative discretion under the Elections

Clause, the state constitutional provision did not negate the statute.  *Id.*  Earlier, in *Opinion of the*

*Justices of the Supreme Judicial Court on the Constitutionality of the Soldiers' Voting Bill,* 45

N.H. 595, 606-07 (1864), the New Hampshire Supreme Court upheld a similar statute

authorizing federal absentee ballots for soldiers, contrary to the State Constitution's local-voting

requirement.  The court recognized that state legislatures exercise their Elections Clause

authority "untrammeled by the provision of the State constitution."  *Id.* at 605.  The legislative

act therefore stood despite contradicting the State Constitution.  *Id.* (state constitution "has no

concern with the question, except so far as it is referred to and adopted by the Constitution of the

United States."); *see also In re Plurality Elections,* 8 A. 881, 882 (R.I. 1887) ("[T]he state

constitution is manifestly in conflict with [the Elections Clause] if it be construed to . . . impose

---

carefully limited to *state* legislative redistricting.  *See, e.g.*, Ga. Const. art. III, § II; Md. Const.
art. III, § 4; Mont. Const. art. V, § 14.

*Diaz-Balart, et al. v. Browning, et al.*
*Case No.* 10 - 23968 - UNGARO

a restraint upon the power of prescribing the manner of holding such elections which is given to

the legislature by the constitution of the United States without restraint . . . .").

This judicial understanding was consistent with that of Congress, which considered the

issue when the United States House of Representatives sat in its capacity as Judge of the

Qualifications, Elections, and Returns of its Members.  *See Baldwin v. Trowbridge*, H.R. Rep.

No. 39-13, at 1-3 (1866).[10]  The outcome of a congressional election depended on the validity of

soldiers' absentee votes.  *Id.*  The State's Constitution required in-state voting, but the legislature

adopted a statute permitting otherwise.  The House Committee on Elections concluded that the

statute was valid, notwithstanding the contrary constitutional provision, explaining that the

legislature's authority to regulate congressional elections "was derived from the Constitution,

and not from any previously existing power, and if it was conferred upon the legislature by the

Constitution, a [state] constitutional convention could not exercise it, *or inhibit the legislature*

*from exercising it*."  *Id.* (emphasis added); *accord id.* ("The law having been passed by the

legislature and not being in conflict with the Constitution or laws of the United States, was

valid . . . ."); *see also* Asher C. Hinds, *Hinds' Precedents of the House of Representatives of the*

*United States*, Vol I, § 525 at 667, 672 (1907) (quoting legislative report) (House of

Representatives concluding "the time of electing Members of Congress can not be prescribed by

the constitution of a State, as against an act of the legislature of a State or an act of Congress").

Further support comes from more recent federal decisions regarding Article II, Section 1,

which is analogous to the Elections Clause.  *Cf. U.S. Term Limits*, 514 U.S. at 804-05 (Elections

Clause duty "parallels the duty under Article II").  That provision directs States to appoint

---

[10] *Reprinted in* Chester A. Rowell, A Historical Legal Digest of All the Contested Election Cases in the House of Representatives of the United States from the First to the Fifty-Sixth Congress, at 200-01 (1901).

presidential electors "in such Manner as the Legislature thereof may direct." *Id.* In *Bush v. Palm*

*Beach County Canvassing Board*, 531 U.S. 70 (2000) (per curiam), the United States Supreme

Court vacated the Florida Supreme Court's decision that invalidated a state canvassing law. *Id.*

at 78. The Supreme Court was concerned that the Florida Court relied on the State Constitution

to invalidate the Legislature's Article II, Section 1 authority. *Id.* at 77 ("There are expressions in

the opinion of the Supreme Court of Florida that may be read to indicate that it construed the

Florida Election Code without regard to the extent to which the Florida Constitution could,

consistent with [Article II, Section 1], 'circumscribe the legislative power.'"). The Court relied

on (and quoted) *McPherson v. Blacker*, 146 U.S. 1 (1892), which described the legislature's

"plenary" authority under Article II, Section I: "The appointment of these electors is thus placed

absolutely and wholly with the legislatures of the several states . . . ." *Id.* at 34-35 (*quoting* S.

Rep. No. 43-395, at 9 (1874)). In *McPherson*, the Court rejected the notion that the *people*—as

opposed to their legislatures—could exercise this authority. "The clause under consideration

does not read that the people or the citizens shall appoint . . . ." *Id.* at 25. Had the Federal

Constitution merely delegated authority to "States," the state legislatures' decisions would have

stood only "in the absence of any provision in the state constitution in that regard." *Id.* But

instead, the Constitution provided that each State shall act "in such Manner as the Legislature

thereof may direct." *Id.*; *see also Libertarian Party of Ohio v. Brunner*, 567 F. Supp. 2d 1006,

1011 (S.D. Ohio 2008) ("Plaintiffs correctly contend that only the legislative branch has the

authority, under Articles I and II of the United States Constitution, to prescribe the manner of

electing candidates for federal office.").[11]

---

[11] *Bush v. Gore* later provided the Court an opportunity to resolve finally the 2000 presidential election dispute. Although the majority decided the case on other grounds, Chief Justice Rehnquist's concurrence, joined by two other Justices, seized on *McPherson*'s principles.

*Diaz-Balart, et al. v. Browning, et al.*
*Case No.* 10 - 23968 - UNGARO

The Article II reasoning applies equally to the Elections Clause.  In both contexts, the Federal Constitution imposed a direct lawmaking duty on the state legislatures in determining procedures relating to the election of federal officeholders.  And in neither case may the legislature be excluded from the process nor, by implication, can the Legislature's discretion to act be circumscribed or limited.

IV.   **AMENDMENT SIX IS INVALID BECAUSE IT IS NOT AN APPROPRIATE REGULATION OF THE TIME, PLACE, OR MANNER OF FEDERAL ELECTIONS.**

Amendment Six suffers from an additional and independent defect.  Even putting aside that it was enacted outside of the legislative process, it purports to impose substantive requirements that exceed a State's authority to adopt rules governing the time, place, or manner of federal elections.  As the Supreme Court has emphasized, this grant of authority (even when properly exercised by a legislature) extends only to "procedural regulations" and is "not as a source of power to dictate electoral outcomes."  *U.S. Term Limits*, 514 U.S. at 833-34; *see also id.* at 832 ("The Framers intended the Elections Clause to grant States authority to create procedural regulations"); *Smiley,* 285 U.S. at 366 (Elections Clause authorizes "procedure and safeguards"); *Foster v. Love,* 522 U.S. 67, 69 (1997) (Elections Clause authorizes rules governing "the mechanics of congressional elections").  Indeed, although the "manner" of federal elections encompasses the drawing of congressional lines, no authority suggests that the Clause's reference to "manner" extends to the establishment of mandatory, substantive criteria for drawing congressional district lines, especially to the extent that such substantive criteria effectively "dictate electoral outcomes," "favor or disfavor" candidates, or otherwise skew the electoral process.  *U.S. Term Limits,* 514 U.S. at 833-34.

---

The Chief Justice reasoned that the Florida Supreme Court could not change the Legislature's electoral plan, and no Justice cast doubt on this analysis.  531 U.S. 98, 113-14 (2000) (Rehnquist, C.J., concurring).

In *Cook v. Gralike*, 531 U.S. 510 (2000), the Court invalidated a provision of Missouri law requiring federal ballots to include disclaimers regarding the candidates' position on term limits. *Id.* at 514. Missouri defended the provision as a regulation of the "time, place, and manner" of federal elections. *Id.* at 515. Although the Elections Clause plainly reaches balloting regulations, *Smiley*, 285 U.S. at 366, the Court found the provision was "far from regulating the procedural mechanisms of elections," *Cook*, 531 U.S. at 525-26. Instead, it was designed to favor certain candidates and to handicap certain others. *Id.* at 525. It therefore attempted to "dictate electoral outcomes." *Id.* at 526 (quoting *U.S. Term Limits*). "Such 'regulation' of congressional elections simply is not authorized by the Elections Clause." *Id.*

Here, likewise, Amendment Six is no mere procedural or mechanical regulation governing congressional elections. It seeks to impact the electoral outcomes themselves. Indeed, the state legislators who intervened here admit they are "prospective Congressional candidates," and that "[t]he resolution of this action will directly affect [their] ability to protect their interests." (DE 46 at 4.) Their interest to be protected, presumably, is their ability to win elections by the use of a redistricting scheme favoring their candidacies while tying the hands of the Florida Legislature. Congress, of course, has the authority to enact such substantive requirements.[12] But the Constitution's delegation of authority to state legislatures to adopt rules governing the "Times, Places, and Manner" of congressional elections does not extend that far.

---

[12] Although primarily tasking state legislatures, the Elections Clause reserves to Congress the authority to "make or alter such Regulations, except as to the Place of chusing Senators." U.S. Const. art. I, § 4. Congress has exercised this reserved authority several times. In The Apportionment Act of 1842, 5 Stat. 491, Congress imposed a requirement for single-member, contiguous districts. Later, in The Apportionment Act of 1862, 12 Stat. 572, and in 1872, Congress renewed these requirements and mandated districts with nearly equal populations. 17 Stat. 28, § 2. In The Apportionment Act of 1901, Congress imposed required compactness. 31 Stat. 733. Currently, the lone statutory requirement is for single-member districts. *See* 2 U.S.C. § 2c. This case concerns the authority of the Amendment Six in the first instance—not the authority of Congress to override or supplement such a measure.

*Diaz-Balart, et al. v. Browning, et al.*
*Case No.* 10 - 23968 - UNGARO

## <u>CONCLUSION</u>

Because Amendment Six was enacted wholly outside of the state legislative process and imposes requirements that go beyond simply regulating the "manner" of congressional elections, the Court should declare that it is invalid and grant judgment in Plaintiffs' favor.

**WHEREFORE**, Plaintiffs respectfully ask that the Court (i) grant this Motion, (ii) enter final judgment in Plaintiffs' favor, (iii) declare Amendment Six invalid, and (iv) grant Plaintiffs such other relief the Court finds appropriate.

/s/ *Stephen M. Cody*
Stephen M. Cody
Fla. Bar No. 334685
16610 SW 82 Court
Palmetto Bay, Florida 33157
(305) 753-2250
Fax (305) 468-6421
stcody@stephencody.com
*Attorneys for Plaintiffs Corrine Brown and*
*Mario Diaz-Balart*

/s/ *Allen Winsor*
George N. Meros, Jr.
Fla. Bar No. 263321
Allen Winsor
Fla. Bar No. 016295
GRAYROBINSON PA
Post Office Box 11189
Tallahassee, FL 32302
(850) 577-9090
Fax (850) 577-3311
gmeros@gray-robinson.com
awinsor@gray-robinson.com
- *and-*
Miguel De Grandy
Florida Bar No. 332331
800 Douglas Road, Suite 850
Coral Gables, Florida 33134
(305) 444-7737
Fax (850) 443-2616
mad@degrandylaw.com
*Attorneys for Intervening Plaintiff, Florida*
*House of Representatives*

*Diaz-Balart, et al. v. Browning, et al.*
*Case No.* 10 - 23968 - UNGARO

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing was electronically served through the Court's CM/ECF system, unless otherwise noted, this 25th day of April, 2011 to the following:

Harry Thomas
Radey Thomas Yon and Clark
301 South Bronough Street
Suite200
Tallahassee, Florida 32301
Phone: 850-425-6654
Email: hthomas@radeylaw.com
*Attorneys for the Florida Secretary of State*

Eric R. Haren
Michael B. DeSanctis
Paul M. Smith
Jenner & Block, LLP
1099 New York Avenue, NW
Washington, DC 20001
Phone: 202-639-6000
Email: eharen@jenner.com
*Attorneys for Intervenors Leon Russell,*
*Patricia T Spencer, Carolyn H Collins, Edwin*
*Enciso, Stephen Easdale, Florida State*
*Conference of NAACP Branches and*
*Democracia Ahora*

J. Gerald Hebert
191 Somervelle Street, #405
Alexandria, VA 22304
Phone: 703-628-4673
Fax: 567-5876
Email: GHebert@campaignlegalcenter.org
*Attorneys for Intervenors Leon Russell,*
*Patricia T Spencer, Carolyn H Collins, Edwin*
*Enciso, Stephen Easdale, Florida State*
*Conference of NAACP Branches and*
*Democracia Ahora*

Robert M. Norway
Boies, Schiller & Flexner LLP
121 South Orange Ave., Suite 840
Orlando, FL 32801
Phone: 407 792 1294
Email: rnorway@bsfllp.com
*Attorneys for Janet Cruz, Arthenia L. Joyner,*
*Luis R. Garcia, Joseph A. Gibbons and Perry*
*E. Thurston*

Stephen Frederick Rosenthal
Podhurst Orseck Josefsberg et al
City National Bank Building
25 W Flagler Street
Suite 800
Miami, FL 33130-1780
Phone: 305-358-2800
Fax: 305-358-2382
Email: srosenthal@podhurst.com
*Attorneys for Intervenors Leon Russell,*
*Patricia T Spencer, Carolyn H Collins, Edwin*
*Enciso, Stephen Easdale, Florida State*
*Conference of NAACP Branches and*
*Democracia Ahora*

Jon L. Mills
Boies, Schiller, and Flexner, LLP
100 S.E. Second Street
Suite 2800
Miami, FL 33131
Phone 305-539-8400
Email: jmills@bsfllp.com
*Attorneys for Janet Cruz, Arthenia L. Joyner,*
*Luis R. Garcia, Joseph A. Gibbons and Perry*
*E. Thurston*

Carl Edward Goldfarb
Boies Schiller & Flexner
401 E Las Olas Boulevard
Suite 1200
Fort Lauderdale, FL 33301
Phone:  954-356-0011
Fax:  356-0022
Email: cgoldfarb@bsfllp.com
*Attorneys for Janet Cruz, Arthenia L. Joyner,*
*Luis R. Garcia, Joseph A. Gibbons and Perry*
*E. Thurston*

Stuart H. Singer
Boies, Schiller & Flexner LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, FL  33301
Phone:  954-356-0011
Email:  ssinger@bsfllp.com
*Attorneys for Janet Cruz, Arthenia L. Joyner,*
*Luis R. Garcia, Joseph A. Gibbons and Perry*
*E. Thurston*

Joseph W. Hatchett
Akerman Senterfitt
106 East College Avenue
12th Floor
Tallahassee, FL  32301
Tel:  850.224.9634
Fax:  850.222.0103
Email joseph.hatchett@akerman.com
*Attorneys for Janet Cruz, Arthenia L. Joyner,*
*Luis R. Garcia, Joseph A. Gibbons and Perry*
*E. Thurston*

/s/  *Allen Wins*or
Allen Winsor