UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 10-CV-23968-UNGARO

MARIO DIAZ-BALART and
CORRINE BROWN,

    Plaintiffs,

and

THE FLORIDA HOUSE OF
REPRESENTATIVES,

    Plaintiff-Intervenor,

v.

KURT S. BROWNING,
in his official capacity as Secretary of
State of Florida,

    Defendant,

and

FLORIDA STATE CONFERENCE OF
NAACP BRANCHES, *et al*.,

    Intervening Defendants.
_____/

**DEFENDANT SECRETARY'S RESPONSE TO
PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT MOTION FOR
SUMMARY FINAL JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

Defendant, Kurt S. Browning in his official capacity as Secretary of the State of Florida ("Secretary"), responds in opposition to Plaintiffs' and Plaintiff-Intervenor's Joint Motion for Summary Final Judgment and Incorporated Memorandum of Law (Doc. 67) and requests that Plaintiffs' Motion be denied. In support of the requested denial, the Secretary presents the following argument:

## I.  INTRODUCTION AND BACKGROUND.

The Elections Clause, contained in Article I, Section 4 of the United States Constitution, provides that the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof," subject to the authority of Congress to, at any time, make or alter such laws.  Although the Elections Clause delegates to state "Legislatures" the authority to draw congressional districts, the Supreme Court has determined that this delegation by no means frees state legislatures from the legislative restrictions and processes that state constitutions often impose.  To the contrary, the Supreme Court has upheld state constitutional restraints on lawmaking and has determined that a state retains the ultimate authority to define the lawmaking process by which congressional districts are drawn.  *Smiley v. Holm*, 285 U.S. 355 (1932); *Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565 (1916).

Notwithstanding this precedent, Plaintiffs Diaz-Balart, Brown and the Florida House of Representatives ("Plaintiffs"), argue that the Elections Clause precludes the citizenry of this State from amending their State Constitution to revise and limit the legislative process for congressional redistricting.  Plaintiffs question the validity of a duly enacted constitutional amendment because it was enacted "wholly outside the legislative process" and "over the Legislature's objection."  Doc. 67, pp. 2, 11.  In doing so, Plaintiffs suggest that, contrary to ordinary principles of constitutional supremacy, the Florida Legislature is the final arbiter of its own authority with respect to congressional redistricting and that constitutional limitations on its congressional reapportionment process are invalid unless adopted by the Legislature itself.  As explained below, the Supreme Court has expressly rejected Plaintiffs' position by sanctioning state constitutional provisions that limit the means by which state legislatures enact

congressional redistricting legislation, thereby confirming the supremacy of state constitutions in the context of congressional reapportionment. Accordingly, Plaintiffs' Motion for Summary Final Judgment must be denied.

## II. AMENDMENT 6 IS A VALID CONSTITUITONAL RESTRICTION ON THE FLORIDA LEGISLATURE'S CONGRESSIONAL REDISTRICTING PROCESS.

The Florida Constitution empowers the Florida Legislature and controls the legislative processes of the State. As such, the Florida Constitution serves as the final arbiter of legislative authority. The Supreme Court has determined that the power granted by the Elections Clause to regulate congressional elections does not displace the ordinary supremacy that state constitutions retain over their state legislatures and has rejected the notion that the Elections Clause grants state legislatures the ultimate authority to define the lawmaking process by which congressional districts are drawn. Because Amendment 6 prescribes the legislative process for congressional redistricting and was enacted pursuant to the constitutional process by which all legislative processes are established, it is not violative of the Elections Clause delegation to state legislatures and is a valid restriction on the congressional redistricting process.

### A. The Florida Constitution Prescribes the State's Legislative Processes and Is the Final Arbiter of Legislative Authority.

The Florida Constitution establishes, empowers and restrains the institutions of Florida's government, including the Florida Legislature. Like all state constitutions, the Florida Constitution strikes a balance between empowering and restraining its State government. The way the State of Florida chooses to strike this balance is left to the citizens of Florida, as "[a]ll political power is inherent in the people." Fla. Const. art. I, § 1. The Florida Legislature, therefore, is an organ of the State government, and its existence, legitimacy and power is embodied in the Florida Constitution, as determined by the people of Florida.

Through their adoption of the Florida Constitution, the people of Florida have empowered the Florida Legislature to exercise the State's lawmaking power. *See* Fla. Const. art. III, § 1. As explained in the Secretary's Cross-Motion for Summary Judgment and Incorporated Memorandum of Law ("Cross-Motion"), the Florida Constitution controls the power granted to the Florida Legislature by establishing limitations on the exercise of lawmaking authority.[1] By prescribing when and how the Florida Legislature exercises its lawmaking power, the Florida Constitution establishes the process for legislative enactments. *See, e.g.*, Fla. Const. art. III, § 6 (requiring laws to "embrace but one subject matter"); *id*. § 7 (prescribing procedure for the passage of bills); *id*. § 8 (subjecting legislative bills to executive veto); *id*. § 10 (precluding "special laws" pertaining to various subjects). Thus, the Florida Legislature looks to the Florida Constitution for the limitations on its authority and the legislative processes with which it must comply. *State v. Bd. of Public Instruction for Dade Co.*, 126 Fla. 142, 151 (Fla. 1936) (holding that "[t]he [Florida] Legislature . . . looks to the [Florida] Constitution for limitations on its power").

Accordingly, the Florida Constitution, rather than the Florida Legislature, is the final arbiter of legislative authority. Indeed, it is well established that the lawmaking power of the Florida Legislature is supreme *except as limited by the Florida Constitution*. *State ex rel. Cunningham v. Davis*, 123 Fla. 41, 61 (Fla. 1936) ("The test of legislative power is constitutional restriction; what the people have not said in their organic law their representatives shall not do, they may do."). As an "instrumentality" of the State of Florida, the Florida Legislature must comport with the legislative processes imposed by the Florida Constitution. *Id*. at 62.

---

[1] For a more complete exposition of Florida's constitutional system and the various limitations and controls on the Florida Legislature's exercise of its lawmaking authority, see the Secretary's Cross-Motion, pages 3-4.

4

### B. Amendment 6 Controls the Legislative Process for Congressional Redistricting.

Because the Florida Constitution reserves to the people the power to revise or amend any portion of the Florida Constitution, the people retain the power to determine who exercises the State's lawmaking power and how that power is exercised. *See* Fla. Const. art. XI, § 3 ("The power to propose the revision or amendment of any portion or portions of this constitution by initiative is reserved to the people."). In other words, all power resides with the people of Florida, and the people retain the power to define the scope of legislative authority and alter and reshape the legislative processes with which the Legislature is bound to comply.

In November 2010, the people of Florida exercised their inherent power to control the legislative processes of the State. By proposing and subsequently approving Amendment 6 to the Florida Constitution, the Florida electorate changed the legislative process for congressional redistricting. There is no question (and Plaintiffs do not dispute) that Amendment 6 was proposed and approved in accordance with the constitutionally prescribed process for amending the Florida Constitution. Proposed pursuant to Article XI, Section 3, and approved pursuant to Article XI, Section 5, Amendment 6 effectively modifies the process by which the Legislature draws congressional districts.[2]

Notwithstanding that Amendment 6 was duly enacted in accordance with the constitutional amendment process, Plaintiffs contend that the amendment is void because it was enacted "wholly outside of the legislative process" and "over the Legislature's objection." Doc. 67, p. 2. By arguing that a duly enacted constitutional amendment is void because it was enacted through the constitutional amendment process as opposed to the legislative process, Plaintiffs suggest that the Elections Clause delegation to state legislatures nullifies traditional principles of

---

[2] See the Secretary's Cross-Motion, page 4 for the language of Amendment 6, now Article III, Section 20 of the Florida Constitution.

constitutional supremacy and permits the state legislature to operate independently of the state constitution that created it.  Plaintiffs effectively contend that the Elections Clause delegation to state legislatures alters the internal structure of state government such that the Florida Legislature is the final arbiter of its own authority in the context of congressional reapportionment and that restrictions on the congressional reapportionment process are invalid unless adopted by the Legislature itself.

These contentions must be rejected, however, as the Supreme Court has endorsed traditional principles of state constitutional supremacy in the context of congressional reapportionment and has rejected Plaintiffs' underlying notion that the Elections Clause delegation frees state legislatures from the constraints that the people, through their state constitution, have sought to impose on the legislative process.

### C. The Elections Clause Delegation to State Legislatures Does Not Displace A State Constitution's Ordinary Authority Over Its State Legislature.

In *Smiley v. Holm*, the U.S. Supreme Court considered whether the power granted to regulate congressional elections entails a unique function that justifies displacing a state constitution's ordinary authority over its legislature. 285 U.S. 355, 365 (1932) (finding the core inquiry to be whether the Constitution "invests the legislature with a particular authority, and imposes upon it a corresponding duty, the definition of which imports a function different from that of lawgiver and thus renders inapplicable the conditions which attach to the making of state laws").[3]  The Court determined that federally granted powers, such as the Elections Clause, that

---

[3] The Secretary incorporates by reference his Memorandum of Law filed in support of his Cross-Motion for Summary Judgment.  As explained in the Secretary's Cross-Motion, the Elections Clause is one of several constitutional provisions granting federal authority to the state "legislature."  *See* Cross-Motion, pp. 5-6.  To understand the nature of the delegation in each particular provision, it is necessary to identify the function that the state legislature is expected to perform.  *Smiley*, 285 U.S. at 365 ("The question here is . . . the function to be performed.").

6

only require the state legislatures to make laws, do not justify displacing the state constitution's ordinary supremacy. The Court expressly held that nothing in the Elections Clause "endow[s] the Legislature of the state with power to enact laws in any manner other than that in which *the Constitution of the state* has provided that laws shall be enacted." *Id*. at 368 (emphasis added). The Court found "no intimation" of a purpose to exclude restrictions "*imposed by state Constitutions* upon state Legislatures when exercising the lawmaking power." *Id*. at 369 (emphasis added).

Similarly, in *Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565 (1916), the Supreme Court considered a restriction on the congressional redistricting process imposed by the Ohio State Constitution. Because the restriction (a popular referendum) "constituted *a part of the state Constitution*," it was applicable to the congressional redistricting process. *Id*. at 568 (emphasis added). As the Supreme Court later explained in *Smiley*, "it was because of the authority of the state to determine what should constitute its legislative process that the validity of the requirement of the State Constitution of Ohio, in its application to congressional elections, was sustained." *Smiley*, 285 U.S. at 372.

In these cases, the Supreme Court expressly rejected Plaintiffs' underlying assertion that the Elections Clause nullifies ordinary principles of constitutional supremacy and invalidates modifications to the congressional reapportionment process that are not adopted by the state legislature itself. Both *Smiley* and *Hildebrant* involved state constitutional restrictions on the legislative process. The Court, in both cases, upheld the state constitutional provisions as applied to congressional reapportionment, determining that the state, through its state constitution, retains the authority to determine the legislative process by which congressional districts are drawn.

7

### D. Amendment 6 Does Not Conflict With *Smiley* and *Hildebrant*.

Contrary to Plaintiffs' argument, Amendment 6 does not conflict with *Smiley* and *Hildebrant*. In this case, the citizens of Florida have exercised their inherent power to modify the State legislative process. By enacting Amendment 6, the Florida electorate has imposed standards for the Florida Legislature to follow in enacting congressional redistricting legislation.

By arguing that the duly enacted constitutional amendment is void because it was enacted "outside the legislative process," Plaintiffs improperly elevate the ordinary legislative process over the constitutional amendment process. Doc. 67, p. 11. Indeed, Plaintiffs' attempt to distinguish the legislative process from the constitutional amendment process overlooks the Florida Constitution's supremacy over the Florida Legislature and ignores the fact the Florida Constitution *controls* the legislative process. Plaintiffs' argument assumes one can divorce the legislative process from the Florida Constitution and that one can separate what the Florida legislative process is from what the Florida Constitution says it is. This cannot be done, however, as ordinary legislative processes are no more or no less than what the Florida Constitution provides. Ultimately, the legislative process is whatever the Florida Constitution says that it is. Accordingly, Amendment 6 was not enacted outside of the legislative process. Amendment 6 itself establishes the legislative process and was enacted pursuant to the constitutionally permissible method for prescribing the legislative process. *See* Fla. Const. art. XI, § 5.

Plaintiffs' suggestion that Amendment 6 is invalid because it was opposed by the Florida Legislature is similarly flawed. That the Florida Legislature opposed the Amendment is irrelevant, as the Florida Constitution authorizes the people to revise and reshape the power they have delegated to the Florida Legislature with or without the Legislature's approval. *See* Fla.

Const. art. I, § 1; *id*. art. XI, § 3, 5. Pursuant to the basic principles of Florida's constitutional system, the Florida Legislature is not the final arbiter of its own authority, as the Florida Constitution plainly operates as the ultimate limitation on legislative authority. *See Cunningham*, 123 Fla. at 61.

This concept of constitutional supremacy was not a remarkable or unfamiliar concept at the time the Federal Constitution was adopted. Indeed, as James Madison explained at the Constitutional Convention, "it would be a novel and dangerous doctrine that a Legislature could change the Constitution under which it held its existence." 2 The Records of the Federal Convention of 1787, at 92-93 (Max Farrand ed., 1966) (quoting James Madison at the Constitutional Convention). Accordingly, the Framers understood the Elections Clause to be a simple delegation to states of power to regulate congressional elections pursuant to their ordinary legal process, whatever that might be. *See Smiley*, 285 U.S. at 368 ("That the state Legislature might be subject to [constitutional] limitation[s] . . . *as the several states might think wise*," is not "incongruous with the grant of legislative authority to regulate congressional elections."). (emphasis added)

*Smiley* and *Hildebrant* confirm the application of these fundamental constitutional principles in the context of congressional reapportionment. By requiring state legislatures to exercise their Elections Clause authority in the manner "in which the Constitution of the state has provided that laws shall be enacted," the Supreme Court confirmed the state constitution's power to dictate the process for legislative enactments, including enactments relating to congressional reapportionment. *Id*. By requiring congressional redistricting legislation to comport with the processes set out in the state constitution, the Court rejected the notion that the Elections Clause

grants state legislatures the independent authority to approve the lawmaking process for reapportioning congressional districts.

This case is no different from *Hildebrant*, where the citizens of Ohio amended the State Constitution to modify the process for legislative enactments. *Hildebrant*, 241 U.S. at 566. If the citizens of a state can alter the legislative process, through constitutional amendment, to provide for the popular referendum of a congressional reapportionment plan, then the citizens of Florida can alter the legislative process, through constitutional amendment, to provide standards for the Legislature to follow in reapportioning congressional districts.[4] In *Hildebrant*, the popular referendum was adopted as a constitutional amendment and not as a legislative enactment, yet it still applied to congressional redistricting legislation. In light of *Hildebrant*, Plaintiffs' insistence on a legislative enactment instead of a constitutional amendment is unwarranted, and the Court should reject Plaintiffs' contention that modifications to the congressional reapportionment process are invalid unless adopted by the Legislature itself.

Plaintiffs further attempt to distinguish this case from *Hildebrant* by arguing that "there is no provision of the Florida Constitution purporting to vest the 'legislative power . . . in the people'" and pointing out that the people of Florida, through the 1968 Constitution, "left all legislative authority exclusively with the Legislature." Doc. 67, pp. 12-13. These arguments

---

[4] Plaintiffs argue that the popular referendum and executive veto provisions in *Smiley* and *Hildebrant* differ from Amendment 6 because "even when these veto measures were exercised, the legislature still had the ultimate responsibility to draw congressional districts as it saw fit (subject to the possibility of a veto)." Doc. 67, pp. 10-11. Similarly, here, the Florida Legislature retains the ultimate responsibility to draw congressional districts as it sees fit, subject to satisfying constitutionally specified standards. Notably, Amendment 6 differs from several state constitutions which more severely restrict the legislature's role in the congressional redistricting process. *See, e.g.*, Cal. Const. art. XXI, § 2 (establishing the "citizens redistricting commission" that is "independent from legislative influence" to draw congressional districts); Idaho Const. art. III, § 2 (directing the secretary of state to form a reapportionment commission to draw congressional districts).

ignore the fact that the people of Florida expressly reserved to themselves the power to define the scope of legislative authority and modify the legislative processes of the State. *See* Fla. Const. art. 1 § 1; *id*. art. XI, § 3; *id*. § 5. It is pursuant to these constitutional provisions that the people of Florida exercised their inherent authority over the Florida legislative process and enacted Amendment 6.

Ultimately, Plaintiffs fail to offer any support for their proposition that the Elections Clause authorizes a legislature, formed by a state constitution, to act unconstrained by the provisions of that constitution defining the extent of its power. *Smiley* and *Hildebrant* do not support such an extreme proposition. To the contrary, both cases demonstrate that state legislatures are not immune from the normal course of regulation by state constitutions.

### E.  Plaintiffs' "Other Authorities" Do Not Demonstrate Amendment 6's Invalidity.

To support their assertion that several state courts have recognized that the Elections Clause grant of authority invalidates state constitutional amendments implicating the congressional redistricting process, Plaintiffs rely on *Dummitt v. O'Connell*, 181 S.W.2d 691 (Ky. 1944), a case involving World War II soldiers that were disenfranchised by their state constitution which precluded absent soldiers from voting in congressional elections. As had courts during the Civil War, the Kentucky Supreme Court felt compelled to get to the "right" result to uphold the soldier-voting law that conflicted with provisions of the Kentucky Constitution. The *O'Connell* court relied almost exclusively on an American Law Reports annotation describing the history of soldier-voting laws and admitted that it possessed "no certainty" that its conclusions regarding the constitutionality of the law were "correct." *Id*. at 695-96.

The remaining state court cases cited by Plaintiffs – *Opinion of the Justices of the Supreme Judicial Court on the Constitutionality of the Soldiers' Voting Bill*, 45 N.H. 595 (N.H. 1864) and *In re Plurality Elections*, 8 A. 881 (R.I. 1887) – were both decided prior to *Smiley* and *Hildebrant*. Thus, to the extent these cases support the proposition that the Elections Clause invalidates state constitutional provisions affecting the congressional reapportionment process, the cases have been overruled by the Supreme Court's subsequent holding in *Smiley* and *Hildebrant*.

Plaintiffs' reliance on the U.S. House of Representatives Committee Report in *Baldwin v. Trowbridge*, H.R. Rep. No. 39-13 (1866)[5] is similarly unpersuasive. Just as the Kentucky Supreme Court in *Dummitt*, the House Committee on Elections in *Baldwin v. Trowbridge* was faced with a state constitutional provision precluding absent soldiers from voting in congressional elections. The House Committee on Elections issued two reports. *Id*. The majority report, cited by Plaintiffs, interpreted the term "legislature" in Article I, Section 4 to mean "the legislature *eo nomine*, as known in the political history of the country," not "the legislative power of the State." *Id*. In reaching this decision, the majority disregarded two prior contested election cases in which the House determined that provisions of a state constitution prevail where there is a conflict between the state constitution and an act of the state legislature regarding the times, places and manner of conducting congressional elections.[6]

---

[5] *Reprinted* in Chester H. Rowell, A Historical Legal Digest of All the Contested Election Cases in the House of Representatives of the United States from the First to the Fifty-Sixth Congress, at 200-01 (1901).

[6] *See* Cross-Motion, pp. 15-16, citing *Farlee v. Runk*, H.R. Rep. No. 29-2 (1845) and *Shiel v. Thayer*, H.R. Rep. No. 37-4 (1861). In both cases, the House Committee on Elections determined that, where there is a conflict between the state constitution and the act of the legislature regarding the regulation of congressional elections, the provisions of the state constitution prevail.

12

By contrast, the minority report issued in *Baldwin* recognized that the state "legislature" referred to in Article I, Section 4 is "the creature of the organic law of the State, owes its existence to it, and can rightfully do nothing in contravention of its provisions." *Baldwin v. Trowbridge*, H.R. Rep. No. 39-14. The minority report further recognized that the Elections Clause delegation is to the state legislature "acting in subordination and in conformity to that organic law to which it owes its own existence." *Id*. The Supreme Court subsequently echoed this very sentiment in *Smiley* when it required a state legislature to exercise its Elections Clause authority in the "manner . . . in which the Constitution of the state has provided." 285 U.S. at 368.

Finally, the Supreme Court interpretations of Article II, Section 1 in *Bush v. Palm Beach County Canvassing Board*, 531 U.S. 70 (2000) and *McPherson v. Blacker*, 146 U.S. 1 (1892) should not affect this Court's Elections Clause analysis. First, the language of the delegation in the Elections Clause differs from the language of the delegation in Article II, Section 1 which provides that "[e]ach state shall appoint" presidential electors "in the manner as the Legislature thereof may direct." *Compare* U.S. Const. art. I, § 4 (providing that the regulation of congressional elections "shall be prescribed in each State by the Legislature thereof"). Although both provisions refer to the state "Legislature," "[t]he use in the Federal Constitution of the same term in different relations does not always imply the performance of the same function." *Smiley*, 285 U.S. at 365. While the Elections Clause requires state legislatures to *regulate* congressional elections, Article II, Section 1 requires state legislatures to *appoint* presidential electors.[7] The

---

[7] *See Smiley*, 285 U.S. at 366 (referring to the second clause of Article I, Section 4, which provides that "the Congress may at any time by law make or alter such regulations" and holding that "[t]he phrase 'such regulations' plainly refers to regulations of the same general character that the legislature of the State is authorized to prescribe with respect to congressional elections").

13

Supreme Court in *Smiley* made clear that the constitutional delegation to state legislatures to regulate congressional elections under the Elections Clause "involves lawmaking in its essential features and most important aspects." *Id*. at 366.[8] The Supreme Court has never expressly held, however, that appointing presidential electors involves lawmaking in the traditional sense.

Moreover, the Supreme Court's refusal to defer to state courts with respect to the appointment of presidential electors and its preference for state courts in the context of congressional redistricting indicates a difference in the degree of authority granted to the states under Articles I and II.  In *Growe v. Emison*, 507 U.S. 25 (1993), the Supreme Court held that state courts have a significant role in congressional redistricting and that federal courts must defer consideration of disputes involving redistricting where the State, through its legislative *or* judicial branch, has begun to address the task itself.  Citing to Article I, Section 4, the Court said "once again what has been said on many occasions:  reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court." *Id*. at 34.   The Court emphasized that both the state legislative and judicial branches are preferred over federal courts as agents of apportionment.  *Id*.  The Court's deference to state courts with respect to congressional reapportionment under The Elections Clause differs from the Court's treatment of state courts in the context of appointing presidential electors under Article II.  *See Palm Beach Co. Canvassing Bd.*, 531 U.S. at 76 (affording the Florida Supreme Court little to no deference with respect to the appointment of presidential electors).   Given this differential treatment, there is a difference in the scope of the delegation under Article I from that under Article II.

---

[8] *Also see* Cross-Motion, pp. 5-6.

In any event, there are only two Supreme Court decisions addressing the narrow issue in this case. *See Lance v. Coffman*, 549 U.S. 437, 442 (2007) (referring to *Smiley* and *Hildebrant* as "[o]ur two decisions construing the term 'Legislature' in the Elections Clause"). And, significantly, both cases demonstrate that the Elections Clause does not exempt state legislatures from the normal course of regulation by state constitutions.

## III.  AMENDMENT 6 IS AN APPROPRIATE REGULATION OF THE MANNER OF FEDERAL ELECTIONS.

Plaintiffs further question the validity of Amendment 6 contending that the constitutional provision seeks to "impact the electoral outcomes themselves" and, therefore, "exceed[s] a State's authority to adopt rules governing the time, place or manner of federal elections." Doc. 67, pp. 18-19. Contrary to Plaintiffs' argument, Amendment 6 imposes universally accepted standards recognized for congressional redistricting and is an appropriate regulation of the manner of federal elections.

"The Elections Clause gives States the authority 'to enact the numerous requirements as to procedure and safeguard which experience shows are necessary in order to enforce the fundamental right involved.'" *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 834 (1995) (citing *Smiley*, 285 U.S. at 366). This grant of authority unquestionably encompasses the power to draw congressional lines. *See Growe*, 507 U.S. at 34 (holding Article I, Section 4 grants the States the authority to apportion congressional districts); *Smith v. Clark*, 189 F.Supp.2d 548 (S.D. Miss. 2002) ("No case – or any other authority – has ever expressed doubt that [Article I, Section 4] applies to congressional redistricting.").

By adopting Amendment 6, Florida has joined the ranks of many states by establishing standards for congressional redistricting.[9] Amendment 6 imposes six standards for the Legislature to follow in drawing congressional districts lines.  Specifically, Amendment 6 requires districts: (i) to be drawn without the intent to favor or disfavor a political party or an incumbent; (ii) to be drawn without the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process; (iii) to consist of contiguous territory; (iv) to be as nearly equal in population as is practicable; (v) to be compact; and (vi) where feasible, utilize existing political and geographical boundaries.  *See* Fla. Const. art. III, § 20.  These standards are "generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself" and, therefore, do not exceed the State's Elections Clause authority.  *U.S. Term Limits*, 514 U.S. at 834 (citing *Anderson v. Celebrezze*, 460 U.S. 780, 788, n.9 (1983)).

As noted in the Secretary's Cross-Motion for Summary Judgment, several standards established in Amendment 6 are merely duplicative of long-standing constitutional and statutory requirements.[10]  The remaining standards imposed by Amendment 6 represent universally accepted standards for congressional redistricting.  *See, e.g.*, *Larious v. Cox*, 300 F.Supp.2d 1320, 1337 (N.D. Ga. 1982) (recognizing that states have a legitimate interest in drawing compact and contiguous congressional districts that respect political subdivisions); *Carstens*

---

[9] See the Secretary's Cross-Motion, page 16, for a list of state constitutional provisions imposing redistricting standards similar to those prescribed in Amendment 6.

[10] *See* Cross-Motion, pp. 17-18.

*et al. v. Lamm*, 543 F.Supp. 68, 83-87 (D.Colo. 1982); *David v. Cahill*, 342 F.Supp. 463 (D.C. N.J. 1972).[11]

Plaintiffs' reliance on *U.S. Term Limits*, 514 U.S. 779 and *Cook v. Gralike*, 531 U.S. 510 (2001) is misplaced. *U.S. Term Limits* involved a ballot access restriction that effectively imposed term limits on U.S Congressmen and Senators, while *Cook* involved a state constitutional provision requiring federal ballots to include a disclaimer noting the candidate's refusal to support term limits. The provisions at issue in both cases were plainly designed to favor candidates who support term limits and to disfavor those who did not. Amendment 6 is designed to do the exact opposite, as it expressly restricts the Legislature's ability to draw districts that favor or disfavor a particular party or candidate. Plaintiffs make the bare assertion that Amendment 6 "seeks to impact the electoral outcomes themselves" without even indicating which candidates or parties the provision seeks to favor or disfavor. *See* Doc. 67, p. 19.

In any event, the Supreme Court has "approved of state regulations designed to ensure that elections are fair and honest and that some sort of order, rather than chaos, accompanies the democratic process." *U.S. Term Limits*, 514 U.S. at 835 (citations omitted). There is no indication that the standards imposed by Amendment 6 are *anything but* designed to ensure fair and honest elections. Accordingly, Amendment 6 is an appropriate regulation of the manner of federal elections.

---

[11] Moreover, Congress itself previously required congressional districts to be contiguous and compact. *See* Apportionment Act of 1842, 5 Stat. 491 (requiring contiguous districts); Apportionment Act of 1901, 17 Stat. 733 (requiring compact districts). Although Congress has since repealed the compact and contiguity requirements, the former Apportionment Acts demonstrate that compactness and contiguity are appropriate regulations of the manner of federal elections, should a state choose to impose them. *See Smiley*, 514 U.S. at 366-67 (holding that the Elections Clause empowers state legislatures and Congress to enact time, place and manner regulations "of the same general character").

### III. CONCLUSION.

Because Amendment 6 is an appropriate regulation of the manner of federal elections, and because the Supreme Court has rejected Plaintiffs' underlying contention that the Elections Clause grants state legislatures the ultimate authority to define the lawmaking process by which congressional districts are drawn, the Court should deny Plaintiffs' Motion for Summary Judgment.

Dated: May 25, 2011                    Respectfully submitted,


                                                s/Harry O. Thomas
Harry O. Thomas (Fla. Bar No. 195097)
hthomas@radeylaw.com
Radey, Thomas, Yon & Clark, P.A.
301 S. Bronough Street, Suite 200 (32301)
Post Office Box 10967
Tallahassee, Florida 32302-2967
Telephone:   (850) 425-6654
Facsimile:   (850) 425-6694

ATTORNEYS FOR DEFENDANT
KURT S. BROWNING, in his official capacity
as Secretary of State of Florida

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was electronically served through the Court's CM/ECF system, unless otherwise noted, this 25th day of May, 2011, to the following:

| | |
|---|---|
| **Stephen M. Cody** (334685) | **George N. Meros, Jr.** (263321) |
| stcody@stephencody.com | gmeros@gray-robinson.com |
| 16610 SW 82 Court | **Allen C. Winsor** (016295) |
| Palmetto Bay, Florida 33157 | awinsor@gray-robinson.com |
| Telephone:   305-753-2250 | Gray Robinson PA |
| Facsimile:   305-468-6421 | 301 S. Bronough Street, Suite 600 |
| *Attorney for Plaintiffs* | Tallahassee, Florida 32301 |
| *Mario Diaz-Balart and Corrine Brown* | Telephone:   850-577-9090 |
| | Facsimile:   850-577-3311 |
| | *Attorneys for Intervening Plaintiff,* |
| | *Florida House of Representatives* |

18

**Miguel De Grandy** (332331)
mad@degrandylaw.com
800 Douglas Road, Suite 850
Coral Gables, Florida 33134-2088
Telephone:	305-444-7737
Facsimile:	305-443-2616
*Attorneys for Intervening Plaintiff,*
*Florida House of Representatives*

**Randall C. Marshall** (181765)
rmarshall@aclufl.org
American Civil Liberties Union
  Foundation of Florida
4500 Biscayne Blvd., Suite 340
Miami, Florida 33137-3227
Telephone:	786-363-2700
Facsimile:	786-363-1108
	-and-
**Moffatt Laughlin McDonald**
lmcdonald@aclu.org
American Civil Liberties Union
  Foundation, Inc.
230 Peachtree St., N.W., Suite 1440
Atlanta, Georgia 30303-1227
Telephone:	404-523-2721
Facsimile:	404-653-0331
*Attorneys for Defendants*
*ACLU of Florida, Howard Simon,*
*Susan Watson, Joyce Hamilton Henry,*
*and Benetta Standly*

**Michael B. DeSanctis**
mdesanctis@jenner.com
**Paul M. Smith**
psmith@jenner.com
Jenner & Block, LLP
1099 New York Avenue, NW
Washington, DC 20001
Telephone:	202-639-6000
Facsimile:	202-639-6066
	-and-

**Charles G. Burr** (0689416)
Burr & Smith, LLP
442 W. Kennedy Blvd., Suite 300
Tampa, FL 33606
Telephone:	813-253-2010
Facsimile:	813-254-8391
	-and-
**J. Gerald Hebert**
GHebert@campaignlegalcenter.org
191 Somervelle Street, #405
Alexandria, VA 22304
Telephone:	703-628-4673
Facsimile:	703-567-5876
	-and-
**Stephen Frederick Rosenthal** (0131458)
srosenthal@podhurst.com
Podhurst Orseck Josefsberg, et al.
City National Bank Building
25 W. Flagler St., Suite 800
Miami, Florida 33130-1780
Telephone:	305-358-2800
Facsimile:	305-358-2382
*Attorneys for Intervening Defendants*
*Leon W. Russell, Patricia T. Spencer,*
*Carolyn H. Collins, Edwin Enciso,*
*Stephen Easdale, Florida State*
*Conference of NAACP Branches,*
*and Democracia Ahora*

**Stuart H. Singer** (377325)
ssinger@bsfllp.com
**Carl Edward Goldfarb** (125891)
cgoldfarb@bsfllp.com
Boies, Schiller, and Flexner, LLP
401 E. Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone:	954-356-0011
Facsimile:	954-356-0022
	-and-
**Jon L. Mills** (148286)
jmills@bsfllp.com
Boies, Schiller, and Flexner, LLP
100 S.E. Second Street, Suite 2800
Miami, Florida 33131
Telephone:	305-539-8400
	-and-

| | |
|---|---|
| **Karen C. Dyer** (716324) | **Joseph W. Hatchett** (34486) |
| kdyer@bsfllp.com | joseph.hatchett@akerman.com |
| **Gary K. Harris** (0065358) | Akerman Senterfitt |
| gharris@bsfllp.com | 106 East College Avenue, 12th Floor |
| Boies, Schiller & Flexner LLP | Tallahassee, Florida  32301 |
| 121 S. Orange Avenue, Suite 840 | Telephone:     850-224-9634 |
| Orlando, Florida  32801 | Facsimile:      850-222-0103 |
| Telephone:     407-425-7118 | ***Attorneys for Intervening Defendants*** |
| Facsimile:      407-425-7047 | ***Janet Cruz, Arthenia L. Joyner,*** |
| -and- | ***Luis R. Garcia, Joseph A. Gibbons,*** |
| | ***and Perry E. Thurston*** |

      s/Harry O. Thomas
Harry O. Thomas