UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| MARIO DIAZ-BALART and CORRINE BROWN, | ) ) ) | |
| Plaintiffs, | ) ) | |
| FLORIDA HOUSE OF REPRESENTATIVES, | ) ) ) | |
| Plaintiff-Intervenor, | ) ) | Case No. 10-CV-23968-UNGARO |
| vs. | ) ) ) | |
| KURT BROWNING, in his official capacity as Florida Secretary of State, | ) ) ) | |
| Defendant, | ) ) | |
| and | ) ) ) | |
| FLORIDA STATE CONFERENCE OF NAACP BRANCHES; DEMOCRACIA AHORA; LEON W. RUSSELL, PATRICIA T. SPENCER, CAROLYN H. COLLINS, EDWIN ENCISO, STEPHEN EASDALE; THE AMERICAN CIVIL LIBERTIES UNION OF FLORIDA; HOWARD SIMON, BENETTA M. STANDLY, SUSAN WATSON, JOYCE HAMILTON HENRY; JANET CRUZ; ARTHENIA JOYNER; LUIS R. GARCIA; JOSEPH A. GIBBONS; PERRY E. THURSTON, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendant-Intervenors. | ) ) | |

## DEFENDANT-INTERVENORS' CROSS-MOTION FOR SUMMARY JUDGMENT AND CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF-INTERVENOR'S JOINT MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

INTRODUCTION ....................................................................................... 1

FACTUAL BACKGROUND ......................................................................... 3

LEGAL STANDARD ................................................................................... 4

ARGUMENT ............................................................................................... 5

I.  THE STANDARDS FOR DRAWING CONGRESSIONAL DISTRICTS
CONTAINED IN ARTICLE 3, SECTION 20  ARE FULLY CONSISTENT WITH
SETTLED LAW. ....................................................................................... 6

   A.  The Elections Clause Plainly Authorizes State Law Standards for the Way
   Legislatures Conduct Congressional Redistricting. ..................................... 6

      1.  The Supreme Court's Decisions in Hildebrandt and Smiley Compel Summary
      Judgment for Defendants. ..................................................................... 6

      2.  Plaintiffs' Arguments To the Contrary Are Illogical and Have no Support in
      Law or Precedent. ............................................................................... 11

II. PLAINTIFFS' POSITION IS SO CONTRARY TO THE SETTLED
UNDERSTANDING OF THE ELECTIONS CLAUSE THAT ACCEPTING IT
WOULD UPEND ESTABLISHED PRACTICES NATIONWIDE. ..................... 16

CONCLUSION ............................................................................................ 18

i

# TABLE OF AUTHORITIES

CASES

*Advisory Opinion to Attorney General re Standards For Establishing Legislative District Boundaries*, 2 So. 3d 175 (Fla. 2009) ..................................................................1, 3

*Brown v. Saunders*, 166 S.E. 105 (Va. 1932) ..............................................17

*Bush v. Holmes*, 919 So. 2d 392 (Fla. 2006)................................................12

*Carroll v. Becker*, 285 U.S. 380 (1932) ........................................................9

*Carstens v. Lamm*, 543 F. Supp. 68 (D. Colo. 1982)....................................15

*Chiles v. Phelps*, 714 So. 2d 453 (Fla. 1998)...............................................12

*City of Rome v. United States*, 446 U.S. 156 (1980), *superseded by statute as stated in Northwest Austin Municipal Utility District Number One v. Holder*, 129 S. Ct. 2504 (2009) ............................................................................................................15

*Commonwealth ex rel. Dummit v. O'Connell*, 181 S.W.2d 691 (Ky. 1944) ................14

*Cook v. Gralike*, 531 U.S. 510 (2001) ..........................................................15

*Crist v. Florida Ass'n of Criminal Defense Lawyers*, 978 So. 2d 134 (Fla. 2008)......12

*Erfer v. Pennsylvania*, 794 A.2d 325 (Pa. 2002) .........................................17

*Hawke v. Smith*, 253 U.S. 221 (1920)........................................................8, 10

*Jean–Baptiste v. Gutierrez*, 627 F.3d 816 (11th Cir. 2010)...........................4

*Karcher v. Daggett*, 462 U.S. 725 (1983) ...................................................15

*Koenig v. Flynn*, 285 U.S. 375 (1932) ..........................................................9

*Lane v. Chiles*, 698 So. 2d 260 (Fla. 1997)...............................................12, 14

*Ohio ex rel. Davis v. Hildebrandt*, 241 U.S. 565 (1916) ...................2, 6, 7, 9, 10, 11, 13

*People ex rel. Salazar v. Davidson*, 79 P.3d 1221 (Colo. 2003) ...................17

*Roberts v. Brown*, 43 So. 3d 673 (Fla. 2010).............................................1, 3

*Shaw v. Reno*, 509 U.S. 630 (1993) .............................................................15

*Smathers v. Smith*, 338 So. 2d 825 (Fla. 1976)............................................2

*Smiley v. Holm*, 285 U.S. 355 (1932) ..............................................2, 6, 8, 9, 10, 11, 12, 13, 14, 15

*Smith v. Clark*, 189 F. Supp. 2d 548 (S.D. Miss. 2002), *aff'd*, 538 U.S. 254 (2003) ..........9, 12, 14

*Smith v. Smathers*, 372 So. 2d 427 (Fla. 1979)................................................................. 12, 17-18

*State ex rel. Davis v. Hildebrandt*, 114 N.E. 55 (Ohio 1916)................................................6, 7, 10

*State v. Division of Bond Financial of Department of General Services*, 278 So. 2d 614
   (Fla. 1973)..................................................................................................................................13

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ...................................................................................15

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995)............................................................15

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008) .............12

Statutes and Constitutional Provisions

2 U.S.C. § 2a(c)..............................................................................................................................10

Ariz. Const. Art. IV, pt. 2, §1 .......................................................................................................16

Ariz. Const. Art. IV, pt. 2, §1(14)(B)...........................................................................................17

Ariz. Const. Art. IV, pt. 2, §1(14)(C)...........................................................................................17

Ariz. Const. Art. IV, pt. 2, §1(14)(D)...........................................................................................17

Ariz. Const. Art. IV, pt. 2, §1(14)(E)...........................................................................................17

Ariz. Const. Art. IV, pt. 2, §1(14)(F)............................................................................................17

Ariz. Const. Art. VII, § 1 ..............................................................................................................18

Cal. Const. Art. II § 7 ....................................................................................................................18

Cal. Const. Art. XXI ......................................................................................................................16

Conn. Const. Art. III, § 5 ...............................................................................................................17

Conn. Const. Art. III, § 6 ...............................................................................................................16

Fla. Const. Art. I, § 2 .....................................................................................................................12

Fla. Const. Art. III, § 1 ....................................................................................................................3

Fla. Const. Art. III, § 2 ....................................................................................................................3

Fla. Const. Art. III, § 3 ................................................................................................................3, 12

FLA. CONST. Art. III, § 4 ................................................................................................3

FLA. CONST. Art. III, § 4(a) ..........................................................................................12

FLA. CONST. Art. III, § 4(b) ..........................................................................................12

FLA. CONST. Art. III, § 4(c) ..........................................................................................12

FLA. CONST. Art. III, § 6 ..........................................................................................3, 12

FLA. CONST. Art. III, § 7 ..........................................................................................3, 12

FLA. CONST. Art. III, § 8 ..............................................................................................12

FLA. CONST. Art. III, § 10 ..............................................................................................3

FLA. CONST. Art. III, § 11 ..............................................................................................3

FLA. CONST. Art. III, § 12 ..............................................................................................3

FLA. CONST. Art. III, § 15 ..............................................................................................3

FLA. CONST. Art. III, § 16 ..............................................................................................3

FLA. CONST. Art. III, § 20 ....................................................................................... *passim*

FLA. CONST. Art. III, § 20(a) ..........................................................................................1

FLA. CONST. Art. III, § 21 ..........................................................................................1, 3

FLA. CONST. Art. III, § 21(a) ..........................................................................................1

FLA. CONST. Art. VI, § 1 ..............................................................................................12

FLA. CONST. Art. VI, § 2 ..............................................................................................12

FLA. CONST. Art. VI, § 3 ..............................................................................................12

FLA. CONST. Art. VI, § 4 ..............................................................................................12

FLA. CONST. Art. VI, § 5 ..............................................................................................12

FLA. CONST. Art. VI, § 6 ..............................................................................................12

FLA. CONST. Art. VI, § 7 ..............................................................................................12

HAW. CONST. Art. IV, § 2 ..............................................................................................16

IDAHO CONST. Art. III, § 2 ..............................................................................................16

IND. CONST. ART. II, § 13 ...........................................................................................18

IOWA CONST. ART. III, § 37 ........................................................................................17

MICH. CONST. ART. 2, § 5 ...........................................................................................18

MO. CONST. ART. III, § 45 ..........................................................................................17

MO. CONST. ART. VIII, § 3 ..........................................................................................18

MONT. CONST. ART. V, § 14 .......................................................................................16

N.J. CONST. ART. II, § 2 .............................................................................................16

OHIO CONST. OF 1912, Art. II, § 1c .............................................................................7

OHIO CONST. OF 1912, Art. XVI .................................................................................13

OHIO CONST. ART. II, § 1c .........................................................................................13

U.S. CONST. ART. I, § 4, cl. 1 ...................................................................................2, 5

VA. CONST. ART. II, § 6 ..............................................................................................17

W. VA. CONST. ART. I, § 4 ..........................................................................................17

WASH. CONST. ART. II, § 43 ..................................................................................16, 17

WYO. CONST. ART. III, § 49 ........................................................................................17

**OTHER AUTHORITIES**

Barbara A. Terzian, *Ohio's Constitutions: An Historical Perspective*, 51 CLEV. ST. L.
REV. 357 (2004) .................................................................................................6, 7

Defendant-Intervenors, who are organizations, state legislators and citizens devoted to improving the functioning of democracy in the State of Florida, hereby cross-move for summary judgment pursuant to Fed. R. Civ. P. 56, Local Rule 7.5(a) and this Court's scheduling order of the fourth of April, 2011.  We respectfully submit this incorporated memorandum of law in support of that motion and in opposition to Plaintiffs' and Plaintiff-Intervenor's joint motion for summary judgment.

## INTRODUCTION

On November 2, 2010, the voters of Florida voted by over 62% to amend their state constitution to include standards that the Legislature must follow when drawing state legislative and congressional districts.  *See Roberts v. Brown*, 43 So. 3d 673 (Fla. 2010); *Advisory Opinion to Attorney General re Standards For Establishing Legislative Dist. Boundaries*, 2 So. 3d 175 (Fla. 2009).  They did this by voting for two amendments (numbered 5 and 6), known as the "FairDistricts Amendments." Amendments 5 and 6 prescribed rules for the Legislature to follow in Legislative and Congressional redistricting, respectively.  *See, e.g.*, FLA. CONST. art. III, § 20 ("Amendment 6"or "Art. III, Sec. 20") (applicable to congressional districts).[1]  Among other important reforms, the FairDistricts Amendments stated:  "No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent."  *Id.* §§ 20(a), 21(a).  Other provisions of the Amendments provided for compliance with equal-population, non-discrimination, and traditional geographical redistricting principles.  In supporting the Amendments, the voters were responding to evidence indicating that for decades under the leadership of both parties, legislators had repeatedly configured districts to favor themselves.  This practice had disempowered voters, who had been placed in districts where electoral outcomes were determined long before election day.

Within hours of the 7 p.m. poll closing, two incumbent members of Congress filed this lawsuit.  The Florida House of Representatives subsequently intervened as a plaintiff.  Together, they ask this Court to nullify the people's decision to require that the Legislature take a fair and

---

[1] The two amendments were virtually identical. Amendment 6 (now Article III, § 20 of the Florida Constitution) applies to congressional districts and is at issue in this case.  Amendment 5 (now Article III, § 21 of the Florida Constitution) provides standards for the redistricting of state legislative districts.  It is not at issue in the instant action.

balanced approach when drawing congressional districts.  And their motivation is obvious: they are incumbents and they are threatened by the fact that, for the first time ever, there are fair and neutral standards prohibiting the favoring or disfavoring of particular incumbents or parties.

The Members of Congress and the Florida House ("Plaintiffs") ask this court to hold that the Legislature, when engaged in Congressional redistricting, has plenary and exclusive authority to act as it chooses without regard to state constitutional constraints.  They seek to find support for their contention in the Elections Clause of the United States Constitution, art. 1, § 4, cl. 1, which says: **"The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations."**  At times, they also seem to make a narrower argument – that Art. III, Sec. 20 in particular has no binding effect on the Legislature because it was passed as a citizen initiative and thus is not sufficiently "legislative" in character.

These arguments cannot be squared with the basic structure of Florida's government, which makes the Constitution the supreme law of the state.  *See Smathers v. Smith*, 338 So. 2d 825, 827 (Fla. 1976) ("The Constitution of Florida is a document of limitation by which the people of the state have restricted the forces of government in the exercise of dominion and power over their property, their rights and their lives.").  Nor does either argument find any support whatsoever in the U.S. Constitution or any other federal law.

To the contrary, Plaintiffs' claims are foreclosed by Supreme Court precedents, which recognize that state legislative processes are always subject to the state constitution, and that measures like Art. III, Sec. 20 are perfectly valid means to set standards for redistricting by state legislatures.  In *Ohio ex rel. Davis v. Hildebrandt*, 241 U.S. 565 (1916), and *Smiley v. Holm*, 285 U.S. 355 (1932), the Court made clear that the Elections Clause of the Constitution allows states to regulate congressional elections (and by extension redistricting) through *any* means of lawmaking, including the initiative and referendum, *and* in doing so, that state legislatures remain subject to state constitutional constraints.  Additionally, these cases recognize that Congress itself shared this understanding of the Elections Clause when it authorized the states to regulate congressional redistricting in any manner provided by state law, including by initiative and referendum.

2

In sum, the legislature must follow the direction of Art. III, Sec. 20. It must do so because the legislature is limited by all provisions of the Florida Constitution that are valid under the federal constitution. And the United States Supreme Court has specifically interpreted state constitutional election provisions of other states that are similar to Art. III, Sec. 20 to be valid, constitutional and controlling over state legislatures.

## FACTUAL BACKGROUND

The FairDistricts Amendments appeared on the November 2010 general election ballot. Plaintiffs' SUF ¶ 5. Prior to the election, the Attorney General of Florida requested an advisory opinion from the Florida Supreme Court with respect to whether the FairDistricts Amendments were qualified for placement on the ballot. The Florida Legislature was the only party to object and, over those objections, the Supreme Court approved them. *Advisory Op.*, 2 So. 3d 175. Later, the instant Plaintiffs brought pre-election legal challenges to the Amendments' validity, and again the Florida Supreme Court ruled that the amendments should be presented to the voters. *Roberts*, 43 So. 3d 673. Ultimately, "Amendment 6 was approved by more than 60 percent of the voters." Plaintiffs' SUF ¶ 6.

Amendment 6 thereafter became Section 20 of the legislative article (Article III) of the Florida Constitution. Entitled "Legislature," Article III governs numerous issues concerning the Legislature's functions, including its composition, officers, sessions, and procedures, and the qualifications of its members. *See* FLA. CONST. art. III, §§ 1-4, 7, 15. It places numerous substantive restrictions on the Legislature's power, including a single-subject rule and limitations on the types of special laws the Legislature may pass. *Id.* §§ 6, 10, 11, 12. Article III also regulates state legislative redistricting, governing the number of legislative districts and putting in place numerous substantive requirements concerning those districts. *Id.* §§ 16, 21.

The provision of Article III at issue here (Section 20) states:

> SECTION 20. Standards for establishing Congressional district boundaries.—In establishing congressional district boundaries:
>
> (a) No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their

3

ability to elect representatives of their choice; and districts shall consist of contiguous territory.

(b)   Unless compliance with the standards in this subsection conflicts with the standards in subsection 1(a) or with federal law, districts shall be as nearly equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries.

(c)   The order in which the standards within subsections 1(a) and (b) of this section are set forth shall not be read to establish any priority of one standard over the other within that subsection.

The Members of Congress claim that Art. III, Sec. 20 is "an impermissible effort by Florida to limit the discretion directly delegated by the United States Constitution to the Florida Legislature," and that the Legislature's "discretion may only be limited or circumscribed by the Congress and not by way of an amendment to the Florida Constitution."  Second Amend. Compl. ¶ 23.  The Florida House, intervening as a plaintiff, further states:  "The discretion of state legislatures, in the performance of this federal function, is *not subject to constraint by state constitutional provisions*."  *Id.* ¶ 12 (emphasis added).  "The discretionary power delegated by the Elections Clause to the Legislature is plenary and exclusive, and cannot be limited or circumscribed by the Florida Constitution."  *Id.*  In other words, Plaintiffs are asking this Court to hold that Florida legislators are free to disregard the redistricting standards that were made part of the Florida Constitution by the people.  They want the Legislature to be held above and not bound by the law.

After several amended complaints, Plaintiffs named Florida Secretary of State Kurt Browning as the Defendant in this case.  The Court granted Defendant-Intervenors' motions to intervene.  Order, Apr. 4, 2011, at 1.  Plaintiffs moved for summary judgment on April 25, 2011. *See generally* Plaintiffs' Motion for Summary Judgment ("Pl. Mot.").  As set forth below, Plaintiffs' claims are without any merit.  Defendant-Intervenors now move for summary judgment and respond to Plaintiffs' motion.

## LEGAL STANDARD

"Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Jean–Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).  This case is appropriate for summary judgment in that no party

has suggested the existence of material disputed issues of fact.  The case, and these motions, present a pure legal issue appropriate for determination under Rule 56.

## ARGUMENT

Plaintiffs assert the extreme theory that the Florida Legislature, in drawing congressional district lines, operates with complete immunity from any constraints that may be imposed under the state constitution.  They also argue that Article III, Sec. 20 of the Florida Constitution in particular is not controlling on the legislature merely because it was passed by citizen initiative.  To support these arguments, Plaintiffs cite to the Elections Clause of the U.S. Constitution, which provides:  "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations."  U.S. CONST. art. I, § 4, cl.1.  Plaintiffs' arguments rest on a complete and obvious misconstruction of the seminal Supreme Court cases interpreting this clause, which, contrary to Plaintiffs' contention, actually compel summary judgment for Defendants.

As discussed in Section I, neither the Elections Clause of the U.S. Constitution, nor controlling Supreme Court precedent interpreting that provision provide any support for Plaintiffs' contentions.  *Hildebrandt* and *Smiley* firmly and expressly establish that constitutional amendments generated by initiative may validly limit state legislatures during the redistricting process.  These cases make clear not only that the term "Legislature" under the Elections Clause encompasses initiatives and referenda such as Amendment 6, but also that state legislatures remain subject to state constitutional provisions when acting under the Elections Clause.  Indeed, Art. III, Sec. 20 presents a far more limited restriction on legislative discretion than the broader provisions deemed constitutional in *Hildebrandt* and *Smiley*, and leaves the power to draw congressional lines solely with the Legislature but under new standards for fairness.  Lastly, Section II below demonstrates the extreme nature of Plaintiffs' argument that state legislatures may ignore state constitutions when regulating federal elections.

I.    **THE STANDARDS FOR DRAWING CONGRESSIONAL DISTRICTS CONTAINED IN ARTICLE 3, SECTION 20 ARE FULLY CONSISTENT WITH SETTLED LAW.**

    A.    <u>**The Elections Clause Plainly Authorizes State Law Standards for the Way Legislatures Conduct Congressional Redistricting.**</u>

Plaintiffs argue that Art. III, Sec. 20 violates the Elections Clause either (1) because no state constitutional standards may be imposed upon legislators when they exercise the authority granted by that Clause or (2) because Amendment 6 specifically was "adopted wholly *outside* of the state legislative process" and "over the Legislature's objection." Pl. Mot. at 2.  Plaintiffs' reliance on *Hildebrandt* and *Smiley* for these propositions is entirely unfounded.  Those cases are controlling, but they solidly support the validity of Art. III, Sec. 20 and they foreclose Plaintiffs' claims.  Defendants are entitled to summary judgment on these core arguments.

       1.    *The Supreme Court's Decisions in Hildebrandt and Smiley Compel Summary Judgment for Defendants.*

Plaintiffs claim *Hildebrandt* and *Smiley* stand for the proposition that the Elections Clause gives the sole power to regulate Congressional elections to the legislature, that election measures must be "passed as part of the legislative process," and, therefore, that any state constitutional provision providing standards for redistricting, or at least those passed by initiative, must be struck down.  Pl. Mot. at 2 (internal quotation marks and emphasis omitted).  In reality, *Hildebrandt* and *Smiley* unambiguously hold that the Elections Clause allows states to regulate federal elections through *any* means of law-making, including by initiative and referendum,  and that state legislatures *are* indeed subject to state constitutional standards for congressional redistricting.

    *Hildebrandt* involved an Ohio constitutional provision, enacted by referendum of the people, that allowed the citizens of Ohio to vote to veto a congressional redistricting plan passed by the state legislature.  241 U.S. at 566-67.[2]  Three years later, Ohio voters used their newfound

---

[2]  That provision was newly enacted in an extensive constitutional revision that occurred through the Ohio Constitutional Convention of 1912.  *State ex rel. Davis v. Hildebrandt*, 114 N.E. 55, 56 (Ohio 1916).  The Legislature's only connection to the provision was its decision, in 1909, to "submit[] a referendum on holding a constitutional convention to the voters."  Barbara A. Terzian, *Ohio's Constitution:  An Historical Perspective*, 51 CLEV. ST. L. REV. 357, 381 (2004).  "[T]he proposal passed handily in the referendum," *id.* at 383, and delegates to the convention were elected during subsequent municipal elections.  *Id.* at 383-84.  During the convention, delegates agreed to propose to Ohio voters the referendum veto provision that was at issue in

power to veto the Legislature's congressional redistricting plan.  *Id.*  The Legislature sued to invalidate the people's veto on the grounds that the power to redistrict resided solely in the Legislature pursuant to the Elections Clause.

The Ohio Supreme Court emphatically rejected the Elections Clause challenge to the voters' veto on several grounds, including specifically that *the people's* involvement in regulating the times, places, and manner of federal elections through a referendum veto was fully permitted by the Elections Clause.  As the Ohio Supreme Court explained:

> While article 1, § 4, of the United States Constitution is controlling upon the states in so far as it grants the Legislature of the state authority to prescribe the times, places, and manner of holding elections, this is the quantum of the federal grant. The character of the Legislature, its composition and its potency as a legislative body are among the powers which are, by article 10 of said Constitution "expressly reserved to the states respectively, or to the people."

*State ex rel. Davis v. Hildebrandt*, 114 N.E. 55, 57 (Ohio 1916).  And "the people, **by their state organic law**, unhindered by federal check or requirement, may create any agency as its law-making body, or **impose on such agency any checks or conditions under which a law may be enacted and become operative**."  *Id.* (emphasis added).

The U.S. Supreme Court affirmed that conclusion, rejecting the Elections Clause argument that was renewed in the Supreme Court.  The Court held that any argument that would reject the referendum as being outside the scope of the term "Legislature" in the Elections Clause "must rest upon the assumption that to include the referendum in the scope of the legislative power is to introduce a virus which destroys that power, which in effect annihilates representative government, and causes a state where such condition exists to be not republican in form, in violation of the guaranty of the Constitution."  241 U.S. at 569 (citing U.S. CONST. art. IV, § 4).  Having thus framed the question, the Court answered that such an argument with respect to the *Hildebrandt* referendum was "plainly without substance."  *Id.*

---

*Hildebrandt*.  Amendments Proposed by the Constitutional Convention of 1912, Art. II, § 1c. Voters ratified that provision thereafter.  *Hildebrandt*, 241 U.S. at 566; *see also* Terzian, 51 CLEV. ST. L. REV. at 393.

The Court reaffirmed that conclusion in *Hawke v. Smith*, 253 U.S. 221, 230-31 (1920), describing *Hildebrandt* as holding that a "referendum provision of the state Constitution, when applied to a law redistricting the state with a view to representation in Congress, was not unconstitutional.  Article 1, section 4, plainly gives authority to the state to legislate within the limitations therein named."

Subsequently, in *Smiley*, the Court reaffirmed and further explained *Hildebrandt*.  In *Smiley*, the Minnesota Legislature passed a congressional redistricting plan but the governor, pursuant to his state constitutional authority, vetoed it.  285 U.S. at 361.  Nonetheless, the Minnesota Legislature placed its plan on file with the Secretary of State, and a suit was instituted to prevent elections from being held under the plan.  *Id.*  The suit argued that the governor's veto nullified the plan, *id.* at 362, while the Secretary of State argued that the plan was valid "by virtue of the authority conferred upon the Legislature by article 1, s 4, of the Federal Constitution."  *Id.*  Persuaded by the Secretary's argument, the state trial court dismissed the suit, holding (as urged by Plaintiffs here) that the Elections Clause precluded the governor from interfering with the Legislature's redistricting power.  *Id.* at 363.  The Minnesota Supreme Court affirmed.  *See id.* at 364 (summarizing the ruling below as holding "that the Legislature in redistricting the state was not acting strictly in the exercise of the lawmaking power, but merely as an agency, discharging a particular duty in the manner which the Federal Constitution required").

The U.S. Supreme Court reversed.  Construing the term "Legislature" in the Elections Clause, the Court adopted the following interpretive principle:

> The question here is not with respect to the 'body' as thus described but as to the function to be performed. The use in the Federal Constitution of the same term in different relations does not always imply the performance of the same function. The Legislature may act as an electoral body, as in the choice of United States Senators under article 1, s 3, prior to the adoption of the Seventeenth Amendment.  It may act as a ratifying body, as in the case of proposed amendments to the Constitution under article 5. It may act as a consenting body, as in relation to the acquisition of lands by the United States under article 1, s 8, par. 17.  Wherever the term 'legislature' is used in the Constitution, it is necessary to consider the nature of the particular action in view.

*Id.* at 365-66 (internal citations omitted).  The Court concluded that, **within the Elections Clause, "legislature" must be read expansively, to contemplate the state's entire "function . . . of making laws."**  *Id.* at 366 (emphasis added).  In addition, the Court emphasized that "[t]he subject-matter is the 'times, places and manner of holding elections for senators and representatives.'  It cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections. . . .  All this is comprised in the subject of 'times, places and manner of holding elections,' and involves lawmaking in its essential features and most important aspect."  *Id.*

Having so reasoned, the Court held that the states' Elections Clause power is subject to state constitutional constraints, including a gubernatorial veto.  "[T]he exercise of the authority must be in accordance with the method which the state has prescribed for legislative enactments."  *Id.* at 367.  Continuing, the Court stated that the Elections Clause does not "endow the Legislature of the state with power to enact laws in any manner other than that in which the Constitution of the state has provided."   *Id.* at 368; *see also id.* at 369 ("[I]n providing for congressional elections, and for the districts in which they were to be held, . . . Legislatures [exercise] the lawmaking power and thus [are] subject, where the state Constitution so provide[s], to the veto of the Governor as a part of the legislative process"); *see also Carroll v. Becker*, 285 U.S. 380, 381-82 (1932) (upholding a gubernatorial veto of a legislative congressional redistricting plan); *Koenig v. Flynn*, 285 U.S. 375, 379 (1932) (holding that a congressional plan not submitted to the governor for approval was ineffective law and its rejection did not violate the Elections Clause).

*Hildebrandt* and *Smiley* thus conclusively establish two propositions.  First, the term "Legislature" in the Elections Clause refers not merely to a state's actual legislative body, but to the state's whole apparatus for making laws, including by initiative and referendum.  *See Smiley*, 285 U.S. at 366-67; *Hildebrandt*, 241 U.S. at 568-69; *see also Smith v. Clark*, 189 F. Supp. 2d 548, 553 (S.D. Miss. 2002) (three-judge court) (decisions of the Supreme Court "have made clear that the reference to 'Legislature' in Article I, Section 4 is to the law-making body *and processes of* the state") (emphasis added), *aff'd*, 538 U.S. 254 (2003).  Second, in acting under the Elections Clause, state legislative bodies are fully subject to state constitutional constraints.  *Smiley*, 385 U.S. at 366-67; *see also Smith*, 189 F. Supp. 2d at 553 (citing *Carstens v. Lamm*, 543 F. Supp. 68, 79 (D. Colo. 1982) (three-judge court) ("Congressional redistricting is a law-making

9

function subject to the state's constitutional procedures")  (citing *Smiley*, 285 U.S. 355, and *Koenig*, 285 U.S. 375)).  In short, these cases show that a citizen referendum like the one that created Art. III, Sec. 20 is within the scope and meaning of the word "legislature" in the Elections Clause.

Like the Court, Congress has also understood the Elections Clause to encompass the states' entire law-making processes, including the initiative and referendum.  In 2 U.S.C. § 2a(c), its statute governing the redistricting process, Congress has provided that "[u]ntil a State is redistricted *in the manner provided by the law thereof* after any apportionment, the Representatives to which such State is entitled under such apportionment shall be elected in the following manner . . . ."  (emphasis added).  The prior statute had been worded to require redistricting in a state "[b]y the *Legislature* thereof in the manner herein prescribed." *Hildebrandt*, 114 N.E. at 58.  But Congress amended the language to specify that redistricting must be done "[i]n the manner provided by the law thereof."  *Id*.  The U.S. Supreme Court commented on this statutory change, noting in *Hildebrandt* that, "the legislative history of this last act leaves *no room for doubt* that the prior words were stricken out and the new words inserted for the *express purpose*, in so far as Congress had power to do it, of excluding the possibility of making the contention as to the referendum which is now urged." 241 U.S. at 568-69 (emphases added); *Hawke*, 253 U.S. at 230 (describing *Hildebrandt* as holding that "Congress had itself recognized the referendum as part of the legislative authority" under the Elections Clause).  Thus, the statute, "in its reference to state laws, . . . operate[s] as a legislative recognition of the nature of the authority deemed to have been conferred by the constitutional provision."  *Smiley*, 285 U.S. at 372.

Plaintiffs' claims that the voters of Florida cannot place constitutional limits on the Legislature's ability to draw districts for political purposes are beyond the pale.  If, as the Court recognized in *Hildebrandt* and *Smiley*, the Elections Clause allows enforcement of state constitutional provisions authorizing vetoes of legislative actions by non-legislative actors (governors or voters), it must also allow the far less invasive redistricting standards at issue here.  Under *Smiley* and *Hildebrandt*, non-legislative actors can exercise *total* discretion over whether a legislatively passed redistricting plan becomes law.  Rather than exercise that extreme power, Florida voters took a more moderate approach, leaving the responsibility to draw congressional districts in the Legislature's hands but enacting principles of fairness to guide the process.  Under

*Hildebrandt* and *Smiley*, the legislature plainly has the duty to follow those constitutional requirements.[3]   As the Court put it in *Smiley*, the Elections Clause does not grant legislators "power to enact laws in any manner other than that in which the Constitution of the state has provided that laws shall be enacted."  285 U.S. at 368.

Furthermore, at the most basic level, Art. III, Sec. 20 does not contradict or violate the Elections Clause because it continues to allow the Legislature the power to draw congressional district lines.   In fact, other states have authorized commissions to be the final drafters of Congressional districts.  *See infra*  pp. 16-18.  Here, Art. III, Sec. 20 does not alter the Legislature's status as the body that will draw congressional district lines, it merely imposes standards that the Legislature must follow.   The congressional redistricting process remains in the hands of the Legislature and, therefore, clearly does not violate the Election Clause.

2.      *Plaintiffs' Arguments To the Contrary Are Illogical and Have no Support in Law or Precedent.*

Plaintiffs raise a variety of contentions in support of their position, but all are meritless. First, Plaintiffs seem to offer up a narrower position – that some state constitutional provisions may be controlling on the Legislature in regulating federal elections but that Art. III, Sec. 20 is somehow inferior because it was adopted by initiative.   The Court held in *Hildebrandt*, however, that the genesis of a state constitutional provision is irrelevant.  241 U.S. at 565.  The Court specifically held that the method of adoption of the amendment had no bearing on the Elections Clause question:  "the decision below is conclusive on that subject, and makes it clear that, so far as the state had the power to do it, the referendum constituted a part of the state Constitution and laws, and was contained within the legislative power."  *Id.* at 568.

It is undisputed that the sponsors of Amendment 6 (and 62.9% of Florida voters) followed the appropriate constitutional procedures in securing its enactment in the legislative

---

[3]  Indeed, Plaintiffs concede that the more extreme gubernatorial veto "has been a part of Florida's legislative process since the beginning," Pl. Mot. at 12 n.8, and accept its validity as they must after *Smiley*.  They attempt to distinguish this case from *Smiley* by arguing that "the gubernatorial veto is hardly a unique feature of legislative authority."  *Id.*  But *Hildebrandt* forecloses any notion that the Elections Clause contemplated only conventional types of vetoes of legislative action.   A state constitutional provision allowing the *people* to veto legislative enactments is hardly conventional, and yet the Supreme Court upheld it.   Moreover, even if conventionality were the test, nothing could be more common than substantive constitutional standards for legislative action.

article of the Florida Constitution.[4]  Plaintiffs concede, as they must, that Art. III, Sec. 20 was duly passed and "became effective January 4, 2011."  Pl. Mot. at 3.  As such, it is now "the supreme law of Florida," *Lane v. Chiles*, 698 So. 2d 260, 263 (Fla. 1997), and acts as a limitation on all legislative power, *Crist v. Fla. Ass'n of Criminal Defense Lawyers*, 978 So. 2d 134, 141-42 (Fla. 2008); *Bush v. Holmes*, 919 So. 2d 392, 406 (Fla. 2006).

It follows that Art. III, Sec. 20 is no different from other Florida constitutional limits on the Legislature.  Such limits are numerous:  as the Florida Supreme Court has held, "[t]he Constitution of this state is not a grant of power to the Legislature, but a limitation upon legislative power."  *Chiles v. Phelps*, 714 So. 2d 453, 458 (Fla. 1998); *Bush*, 919 So. 2d at 407.  The Legislature thus is subject to multiple session requirements, *see* FLA. CONST. art. III, § 3; quorum requirements, *id.* § 4(a); public-meeting and journal requirements, *id.* § 4(b)-(c); a single-subject rule, *id.* § 6; multiple reading and related requirements relevant to passage, *id.* § 7; and gubernatorial veto provisions, *id.* § 8.  Likewise, other constitutional provisions also limit the Legislature's discretion, even with respect to federal elections.  *See, e.g.*, *id.* art. VI, § 1 (direct and secret ballot; results determined by plurality; other provisions); *id.* §§ 2-7 (other election regulations); *id.* art. I, § 2 (state constitutional equal-protection clause); *see also Smith v. Smathers*, 372 So. 2d 427, 428-29 (Fla. 1979) (holding that the complete elimination of the opportunity to be a write-in candidate in a congressional race violates Art. VI, Sec. 1, of the Florida Constitution).

The Legislature is not free to disregard these and other state constitutional limitations on its power, merely because it is enacting measures concerning federal elections.  As *Smiley* held, the Elections Clause **does not "endow the Legislature of the state with power to enact laws in any manner other than that in which the Constitution of the state has provided."**  285 U.S. at 368 (emphasis added).  Other federal decisions are in accord.  *See Smith*, 189 F. Supp. 2d at 553 (three-judge court) ("Congressional redistricting is a law-making function subject to the state's constitutional procedures.") (quoting *Carstens*, 543 F. Supp. at 79 (three-judge court) (citing *Smiley*, 285 U.S. 355, and *Koenig*, 285 U.S. 375)).

---

[4] Indeed, the U.S. Supreme Court recently upheld a regulation of federal elections enacted through the initiative power.  *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008).

Second, Plaintiffs contend that Art. III, Sec. 20 regulates congressional elections from "*outside* the legislative process," Pl. Mot. at 11, but *Hildebrandt* forecloses their argument as well.  The people's veto provision from *Hildebrandt* was (and still is) in the legislative article of the Ohio Constitution.  *See* OHIO CONST. art. II, § 1c.  It was placed there by a vote of the people of Ohio.  *See supra* p. 6.  Art. III, Sec. 20 similarly resides in the legislative article of the Florida Constitution.  *See* FL. CONST. art. III, § 20.  It was placed there by a vote of the people of Florida.  Moreover, Art. III, Sec. 20 is far more directly connected to a specific delegation of power by the legislature than was the Ohio provision at issue in *Hildebrandt*:  Art. III, Sec. 20 was adopted using a power directly proposed by the Legislature to the people of Florida, whereas the *Hildebrandt* referendum veto used a provision proposed by a constitutional convention, not the state legislature itself.[5]

Trying to make the point that Florida's initiative process is not part of the "legislative process," Plaintiffs point out that the initiative process is in a different article of the Florida Constitution than the legislative article.  *See* Pl. Mot. at 12 ("The citizen initiative power, on the other hand, resides in Article XI of the Florida Constitution, which governs constitutional amendments.").  Once again, Plaintiffs' contention on this score conflicts with *Hildebrandt*.  Like Art. III, Sec. 20, the provision from *Hildebrandt* was a state constitutional provision adopted through an amendment procedure outside the state constitution's legislative article.  *See* OHIO CONST. OF 1912, art. XVI.  The Supreme Court firmly held that redistricting must be done in compliance with all of the laws of the state, regardless of their genesis.  *Hildebrandt*, 241 U.S. 565; *see also Smiley*, 385 U.S. at 369-70.  Further, Plaintiffs' contention that constitutional provisions adopted as a result of an initiative are not part of the state law-making power is incorrect as a matter of state law.  In Florida, "[a]n amendment to the Constitution, duly adopted, is the last expression of the will and intent of the law-making power."  *See State v. Div. of Bond Fin. of Dep't of Gen. Servs.*, 278 So. 2d 614, 617 (Fla. 1973).  The provisions of the Florida Constitution, even those adopted as a result of an initiative, are "the supreme law of Florida."

---

[5] In 1968, the Florida state legislature proposed to the voters a slate of constitutional revisions, including that the constitution could be amended through citizen initiative.  *See* Journal of the House of Representatives, July 3, 1968, at 89.  Upon subsequent passage by the voters, the initiatives provision became part of the 1968 Florida Constitution.

*Lane v. Chiles*, 698 So. 2d at 263 (rejecting a challenge to a "net ban" provision in the Florida Constitution which was added as the result of an initiative).

Third, Plaintiffs present the Court with a number of non-controlling decisions (some not even from courts), none of which changes the result required by *Smiley* and *Hildebrandt*. Plaintiffs rely on a New Hampshire Supreme Court decision and a congressional election controversy from the Civil War and its immediate aftermath. *See* Pl. Mot. at 15-16. They also rely on a Rhode Island Supreme Court decision from 1887. *Id.* at 15. Because these decisions predate the Supreme Court's controlling decisions in *Smiley* and *Hildebrandt*, they are irrelevant. Only *Commonwealth ex rel. Dummit v. O'Connell*, 181 S.W.2d 691 (Ky. 1944), post-dates *Smiley* and *Hildebrandt*. *Dummit* is a Kentucky state supreme court decision that does not even interpret the Elections Clause. That decision cannot, and clearly does not, overturn *Smiley* and *Hildebrandt*. Moreover, the *Dummit* court, issuing its decision under substantial time pressure in the heat of World War II, expressed extreme uncertainty about its own reasoning. *Id.* at 696 ("We possess no certainty that our indicated conclusions as to the constitutionality of the Act under consideration are correct"). In the final analysis, the Court did not even rely on the Elections Clause for its holding. *Id.* at 696 (relying on "the axiomatic principle that all doubts as to the constitutionality of a legislative enactment should be resolved in favor of its constitutionality").[6] The cases Plaintiffs cite cannot disturb the result dictated by *Smiley* and *Hildebrandt*.

Finally, Plaintiffs make a last-ditch argument – that Art. III, Sec. 20 is not a regulation of the times, places, and manner of federal elections at all, and thus is outside the states' power entirely. Pl. Mot. at 18-19. This argument has no legal support whatsoever. As the Supreme Court said in *Smiley*, the Elections Clause contains "comprehensive words [that] embrace authority to provide a complete code for congressional elections." 285 U.S. at 366. Numerous other cases firmly establish that congressional redistricting falls well within the states' power to set the times, places, and manner of federal elections. *See, e.g.*, *Smith*, 189 F. Supp. 2d at 550 (three-judge court) ("No case—or any other authority—has ever expressed doubt that this

_____

[6] In *Dummit*, 181 S.W.2d at 696, the court also noted that Congress had attempted to confer on members of the armed forces in time of war the right to vote in federal elections, abrogating all contrary state law. There is nothing in Amendment 6 that is contrary to federal law.

constitutional provision applies to congressional redistricting."); *Carstens v. Lamm*, 543 F. Supp. 68, 79 (D. Colo. 1982) (three-judge court); *see also Smiley*, 285 U.S. at 361.  Indeed, the Supreme Court has described several of the substantive provisions found in Art. III, Sec. 20 as "traditional districting principles," *Shaw v. Reno*, 509 U.S. 630, 647 (1993) ("compactness, contiguity, and respect for political subdivisions"), and has applied similar requirements to congressional elections for decades.  *See Thornburg v. Gingles*, 478 U.S. 30 (1986) (applying Section 2 of the Voting Rights Act, 42 U.S.C. § 1973); *City of Rome v. United States*, 446 U.S. 156 (1980) (applying Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c), *superseded by statute as stated in Northwest Austin Mun. Utility Dist. No. One v. Holder*, 129 S. Ct. 2504 (2009); *Karcher v. Daggett*, 462 U.S. 725, 730 (1983) ("one person, one vote").

Plaintiffs' reliance on *Cook v. Gralike*, 531 U.S. 510 (2001), for this argument is ironic in the extreme.  There, the Court struck down a state provision that was literally intended to rig elections by, among other things, requiring that the primary and general election ballots contain the words "DISREGARDED VOTERS' INSTRUCTIONS . . . " next to the name of any candidate that opposed the adoption of term limits.  The Court concluded that such obvious attempts to favor or handicap particular candidates, *id*. at 524-25, and influence the outcome of elections based on the candidates' substantive positions was beyond the authority granted by the Elections Clause.  *Id.* at 523-24.  *Cook* says *nothing* about whether generally applicable redistricting standards are impermissible.  More generally, *Cook* made clear that the Elections Clause allows states to enact measures to "ensure[] that elections are 'fair and honest,'" *id.* at 524, as well as "generally applicable and evenhanded . . . restrictions that protect the integrity and reliability of the electoral process itself," *id.* (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 n.9 (1983)); *see also U.S. Term Limits Inc. v. Thornton*, 514 U.S. 779, 834 (1995) (same); *Smiley*, 285 U.S. at 366-67.  Art. III, Sec. 20 is precisely that.  Contrary to the unlawful provision in *Cook* that was intended to favor certain candidates and handicap others, Art. III, Sec. 20 expressly *prohibits* the favoring or disfavoring of incumbents and parties.  Instead, it imposes neutral and traditional principles such as compactness and respect for political and geographic boundaries that have been recognized for centuries.  In short, Art. III, Sec. 20 was designed to prevent exactly what *Cook* warns against:  legislation, here in the form of gerrymandered redistricting maps, that "dictate[s] electoral outcomes."  531 U.S. 526.  Nothing in *Cook* remotely suggests that Art. III, Sec. 20 falls outside the Election Clause's grant of authority.

None of Plaintiffs' arguments alter the fact that *Hildebrandt* and *Smiley* foreclose Plaintiffs' challenge to Art. III, Sec. 20.  Accordingly, summary judgment must be denied to Plaintiffs and granted to Defendants.

## II.   PLAINTIFFS' POSITION IS SO CONTRARY TO THE SETTLED UNDERSTANDING OF THE ELECTIONS CLAUSE THAT ACCEPTING IT WOULD UPEND ESTABLISHED PRACTICES NATIONWIDE.

Given how settled the law is against challenges like Plaintiffs', many states unsurprisingly have endeavored to fulfill their role as laboratories of democracy by adopting numerous state constitutional structures and standards impacting the congressional redistricting process.  The practical effect of Plaintiffs' extreme position is that <u>all</u> such measures would  be unlawful.  Second Amend. Compl. ¶ 23 ("That discretion may only be limited or circumscribed by the Congress and not by way of an amendment to the Florida Constitution."); House Intervenor Compl. ¶ 12 (the state legislature has "*plenary and exclusive authority*" under the Elections Clause; "the discretion of state legislatures, in the performance of this federal function, is *not subject to constraint by state constitutional provisions*.") (emphasis added).  Indeed, Plaintiffs openly acknowledge that accepting their claim would shatter settled state constitutional law nationwide.[7]  Pl. Mot. at 14 n.9.  The Court should reject Plaintiffs' radical, unsupported position.

To protect the voters' interest, several state constitutions place the responsibility for congressional redistricting safely in the hands of independent commissions.  To date, six states have constitutionally entrusted their congressional redistricting process to such commissions. *See* ARIZ. CONST. art. IV, pt. 2, § 1; CAL. CONST. art. XXI; HAW. CONST. art. IV, § 2; IDAHO CONST. art. III, § 2; N.J. CONST. art. II, § 2; MONT. CONST. art. V, § 14; WASH. CONST. art. II, § 43.  Additionally, in Connecticut, a commission is responsible for congressional redistricting if the legislature fails to do so by a given deadline.  *See* CONN. CONST. art. III, § 6.  The use of commissions for congressional redistricting is widely accepted as a way to mitigate the partisan temptations legislators face during that process.  If Plaintiffs' claim is accepted, these valuable innovations will necessarily be struck down.

---

[7] As shown in this Section, accepting Plaintiffs' position would decimate state constitutional law in *at least seventeen states*:  Arizona, California, Colorado, Connecticut, Florida, Hawaii, Idaho, Indiana, Iowa, Michigan, Montana, New Jersey, Pennsylvania, Virginia, Washington, West Virginia, and Wyoming.  This list is exemplary, not exhaustive.

Carrying Plaintiffs' contention to its logical conclusion, it would have the effect of striking down *every* state constitutional provision placing limitations on the legislature's authority to draw congressional lines, or at a minimum, those constitutional provisions that were created by initiative.  Many state constitutions codify traditional redistricting principles—the very same standards imposed in Art. III, Sec. 20— in the context of congressional redistricting.[8] State courts have been applying these provisions to congressional redistricting for decades, if not longer.  *See, e.g.*, *Brown v. Saunders*, 166 S.E. 105 (Va. 1932) (equal-population requirement); *Erfer v. Pennsylvania*, 794 A.2d 325, 331 (2002) (state constitutional equal protection and free and equal elections clauses); *People ex rel. Salazar v. Davidson*, 79 P.3d 1221, 1231-32, 1240 (Colo. 2003) (state constitutional limit of one redistricting every 10 years).  Nor does the reach of Plaintiffs' argument end at constitutional provisions specific to redistricting.  Their argument is so broad that it would invalidate any state constitutional provision that limits the legislature's congressional redistricting activities.   For example, Plaintiffs' position would require invalidating state constitutional guarantees of equal protection, due process, and access to public records in the congressional redistricting context.

Finally, Plaintiffs' argument is not even limited to constitutional provisions related to congressional redistricting.   Under Plaintiffs' interpretation of the Elections Clause, the state legislatures would have plenary authority to regulate *everything* about congressional elections, free from state constitutional limitation.  Second Amend. Compl. ¶ 23; House Intervenor Compl. ¶ 12.  Thus, any existing state constitutional election regulation would be unconstitutional as applied to congressional elections including, for instance, the long-standing right under Art. VI, Sec. 1, of the Florida Constitution to be a write-in candidate for Congress.  *Smathers*, 372 So. 2d

---

[8] *See, e.g.*, ARIZ. CONST. art. IV, pt. 2, § 1, (14)(B)-(F) (requiring equal population, compactness, contiguity, respect for communities of interest, geographic and political boundaries, and requiring competitive districts where practicable); CONN. CONST. art. III, § 5 (requiring that congressional districts be established in accordance with federal constitutional standards); IOWA CONST. art. III, § 37 (requiring that congressional districts be contiguous and political boundaries be respected); MO. CONST. art. III, § 45 (requiring contiguity, equal population, and compactness); VA. CONST. art. II, § 6 (requiring contiguity, compactness, and equal population); WASH. CONST. art. II, § 43 (requiring equal population contiguity, compactness, respect for natural and political boundaries, and prohibiting discrimination based on political party or other group); W. VA. CONST. art. I, § 4 (requiring contiguity, compactness, and equal population); WYO. CONST. art. III, § 49 (requiring contiguity, compactness, and respect for political boundaries).

at 428-29.  Although Intervenor-Defendants have not conducted an exhaustive search, there is no doubt that Plaintiffs' position undercuts the application of numerous state constitutional provisions nationwide.  *See, e.g.*, IND. CONST. art. II, § 13 (ballot requirement); MO. CONST. art. VIII, § 3 (same); ARIZ. CONST. art. VII, § 1 (ballot secrecy); CAL. CONST. art. II § 7 (same); MICH. CONST. art. 2, § 5 (date of federal elections).

## CONCLUSION

For the foregoing reasons, Plaintiffs' and Plaintiff-Intervenor's joint motion for summary judgment should be denied and Defendant-Intervenors' cross-motion for summary judgment should be granted.

Respectfully submitted this twenty-fifth day of May, 2011,

  /s/ Stephen F. Rosenthal
Stephen F. Rosenthal
Fla. Bar No. 0131458
Podhurst Orseck, P.A
City National Bank Building
25 W. Flager Street
Suite 800
Miami, FL 33130-1780
Telephone: 305-358-2800
Facsimile: 305-358-2382
Email: srosenthal@podhurst.com

Michael B. DeSanctis
Paul M. Smith
Jenner & Block, LLP
1099 New York Ave NW
Suite 900
Washington, DC 20001
Telephone: 202-639-6000
Facsimile: 202-639-6066

J. Gerald Hebert
191 Somervelle Street, #415
Alexandria, VA 22304
Telephone: 703-628-4673

**Attorneys for Intervenors Leon Russell, Patricia T Spencer, Carolyn H Collins, Edwin Encisco, Stephen Easdale, Florida State Conference of NAACP Branches and Democracia Ahora**

  /s/ M. Laughlin McDonald
M. Laughlin McDonald
American Civil Liberties Union Foundation
230 Peachtree Street, NW
Suite 1440
Atlanta, GA 30303
Telephone: 404-523-2721
Email: lmcdonald@aclu.org

**Attorney for American Civil Liberties Union of Florida; Howard Simon, Benetta M. Standly, Susan Watson, and Joyce Hamilton Henry**

/s/  Jon L. Mills
Jon L. Mills (admitted *prohac vice*)
Fla. Bar No. 148286
Boies, Schiller & Flexner LLP
100 Southeast Second Street
Suite 2800
Miami, FL 33131
Telephone: 305-539-8400
Facsimile: 305-539-1307
Email: jmills@bsfllp.com

Joseph W. Hatchett
Fla. Bar No. 34486
Akerman Senterfitt
106 East College Avenue
12th Floor
Tallahassee, FL 32301
Telephone: 850-224-9634
Facsimile: 850-222-0103
Email: Joseph.hatchett@akerman.com

Stuart H. Singer
Fla. Bar No. 377325
ssinger@bsfllp.com
Carl E. Goldbarb
Fla. Bar No. 125891
cgoldfarb@bsfllp.com
Boies, Schiller & Flexner LLP
401 East Las Olas Boulevard
Suite 1200
Fort Lauderdale, FL 33301
Telephone: 954-356-0011
Facsimile: 954-356-0022

Karen C. Dyer
Fla. Bar No. 716324
kdyer@bsfllp.com
Gary K. Harris
Fla. Bar No. 0065358
gharris@bsfllp.com
Boies, Schiller & Flexner LLP
121 South Orange Avenue
Suite 840
Orlando, FL 32801
Telephone: 407-425-7118
Facsimile: 407-425-7047

**Attorneys for the State Legislators**

19

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was electronically served through the Court's CM/ECF system, unless otherwise noted, this 25th day of May, 2011 to the following:

Stephen M. Cody
800 South Douglas Road, Suite 850
Coral Gables, FL 33134-2088
Telephone: 305-416-3135
Facsimile: 305-416-3153
Email: stcody@stephencody.com

**Attorney for Plaintiffs Diaz-Balart and Corrine Brown**

Harry O. Thomas
Fla. Bar No. 195097
Radey, Thomas, Yon & Clark, P.A.
301 S. Bronough Street, Suite 200 (32301)
Post Office Box 10967
Tallahassee, FL 32302-2967
Telephone: (850) 425-6654
Facsimile: (850) 425-6694
Email: hthomas@radeylaw.com

**Attorney for Defendant Kurt Browning, in his official capacity as Secretary of State of Florida**

George N. Meros, Jr.
gmeros@gray-robinson.com
Allen C. Winsor
awinsor@gray-robinson.com
Gray Robinson P.A.
Post Office Box 11189
Tallahassee, FL 32302-1189
Telephone: 850-577-9090
Facsimile: 850-577-3311

Miguel De Grandy
mad@degrandylaw.com
800 Douglas Road, Suite 850
Coral Gables, Florida 33134-2088
Telephone: 305-444-7737
Facsimile: 305-443-2616

**Attorney for Plaintiff-Intervenor Florida House of Representatives**

/s/ Stephen F. Rosenthal
Stephen F. Rosenthal

20