UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10 - CV- 23968 -UNGARO

MARIO DIAZ-BALART and CORRINE
BROWN,

      Plaintiffs,

and

THE FLORIDA HOUSE OF
REPRESENTATIVES,

      Plaintiff-Intervenor,

vs.

KURT BROWNING, in his official capacity as
Secretary of State of the State of Florida,

      Defendant,

and

FLORIDA STATE CONFERENCE OF
NAACP BRANCHES, *et al*.,

      Intervening Defendants.

_____

**<u>PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S CONSOLIDATED JOINT
RESPONSE TO DEFENDANTS' CROSS MOTIONS FOR SUMMARY
JUDGMENT, REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT, AND INCORPORATED MEMORANDUM OF LAW</u>**

    Plaintiffs Mario Diaz-Balart and Corrine Brown, and Plaintiff-Intervenor The Florida

House of Representatives, (collectively "Plaintiffs"), pursuant to the Court's scheduling order,

respectfully submit this consolidated joint response to Defendants' cross motions for summary

judgment (Docs. 72, 74), and reply in support of Plaintiffs' Motion for Summary Judgment (Doc.

67).

*Diaz-Balart, et al. v. Browning, et al.*
Case No. 10-23968-UNGARO

I.    **INTRODUCTION.**

Defendants ask this Court to read the important phrase "by the Legislature thereof" out of the United States Constitution's Elections Clause and, in effect, hold that the Elections Clause authorizes state measures governing congressional elections, even when the state legislature had *no* role in their adoption.  No case supports that counter-textual and far-reaching interpretation of the Constitution.  Instead, the leading Supreme Court cases on the meaning of the Elections Clause make clear that the key inquiry is whether the state redistricting measure was enacted "as *part* of the legislative process."  *Smiley v. Holm,* 285 U.S. 355, 371 (1932) (emphasis added); *accord Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565, 569 (1916).  That interpretation gives meaning to the Framer's use of the phrase "by the Legislature thereof," yet still reserves to the states flexibility in congressional redistricting.  The problem for Defendants is that Amendment Six undeniably was *not* adopted as part of the legislative process.  Indeed, the provision was adopted not only through an initiative process that exists wholly outside the legislative process, but also over the Legislature's opposition.  That makes the provision in this case fundamentally different from those in *Smiley* and *Hildebrant*.

Holding Amendment Six invalid under the Supreme Court's binding interpretation of the Elections Clause will not lead to the parade of horribles suggested by Defendants or require the invalidation of other provisions of Florida law.  And doing so would avoid the untenable result Defendants advocate:  reading words out of the Constitution and contravening binding Supreme Court precedent.

II.   **AMENDMENT SIX IS INVALID BECAUSE IT SEEKS TO REGULATE FEDERAL ELECTIONS BUT WAS ENACTED OUTSIDE OF THE LEGISLATIVE PROCESS.**

There are two overriding points on which the parties agree.  First, Amendment Six is not valid unless authorized by the Elections Clause of the Constitution, which states:  "the Times,

Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State *by the Legislature thereof.*" (Emphasis added.) And second, that the Supreme Court's decisions in *Smiley* and *Hildebrant* provide the Court's definitive interpretation of that Clause.[1] Defendants go on to argue, however, that the Elections Clause authorizes a state redistricting measure *regardless of whether it was enacted as part of the legislative process.* That interpretation is directly contradicted by the Supreme Court's decisions in *Smiley* and *Hildebrant* and, if adopted, would read "by the Legislature thereof" out of the Constitution.[2]

> **A.**     ***Smiley* and *Hildebrant* Hinged on Whether the Provisions Constituted Part of the Legislative Process—Not State Power Generally.**

As Plaintiffs explained in their opening brief, *Smiley* and *Hildebrant* unmistakably hold that the Elections Clause delegates authority to states to regulate congressional elections through their "legislative power." (Doc. 67 at 8-11.) Thus, as the Court explained in *Smiley*, "the exercise of the authority [granted by the Election Clause] must be in accordance *with the method which the state has prescribed for legislative enactments.*" 285 U.S. at 367 (emphasis added). Contrary to Defendants' characterization of Plaintiffs' argument, that does not necessarily mean that the provision must be "adopted by *the Legislature itself.*" (Doc. 71 at 2.) But *Smiley* and

---

[1] Intervening Defendants cite two additional cases decided the same day as *Smiley*. (Doc. 74 at 9.) These one-page decisions offer no value beyond that in *Smiley*; they both affirmed that the Elections Clause does not preclude a gubernatorial veto of a congressional redistricting plan. *See Carroll v. Becker*, 285 U.S. 380, 382 (1932) ("The questions are substantially the same as those which were presented in *Smiley v. Holm*, decided this day, and the judgment is affirmed.") (citations omitted); *Koening v. Flynn*, 285 U.S. 375, 379 (1932) ("For the reasons stated in the opinion in *Smiley v. Holm*, decided this day, the judgment is affirmed.") (citations omitted).

[2] The parties agree that the issue before the Court is a legal one, and that there are no material disputed facts. (Doc. 74 at 4-5.) Intervening Defendants nevertheless filed a statement of facts in which they list numerous facts as "disputed," but they failed to come forward with disputing evidence. (Doc. 75.) They also listed additional facts, (*id.* ¶¶ 8-14), none of which is material to the issues before the Court (and none of which was supported by evidence). At any rate, the Secretary has adopted Plaintiffs' statement of material facts, (Doc. 73), and the Court need not consider any facts beyond those in that statement (Doc. 68).

*Diaz-Balart, et al. v. Browning, et al.*
Case No. 10-23968-UNGARO

*Hildebrant* establish that the provision must be enacted as part of the *legislative process*.

Defendants argue *Smiley* and *Hildebrant* more broadly held that the "states' Election Clause power is subject to state constitutional constraints." (Doc. 74 at 9.) Under Defendants' view, *any* provision embodied in a state constitution is necessarily authorized by the Elections Clause—regardless of whether it was adopted as part of the legislative process. (*See* Doc. 71 at 9; Doc. 74 at 9.) But that argument is unavailing. The Court did not uphold the procedures at issue in *Smiley* and *Hildebrant* simply because they appeared in a state constitution. The Court upheld them because they were part of the states' *legislative process*—as defined in each state's constitution.

The very first sentence in *Hildebrant* explains that under the Ohio Constitution, "the legislative power was *expressly* declared to be vested not only in the senate and house of representatives of the state, constituting the general assembly, but in the people, in whom a right was reserved by way of referendum to approve or disapprove by popular vote *any law enacted by the general assembly*." 241 U.S. at 566 (emphasis added). The decision went on to note that "the referendum constituted a part of the state Constitution and laws, and was contained *within the legislative power*." *Id.* at 568 (emphasis added). It further observed that Congress modified its congressional redistricting act "by inserting a clause plainly intended to provide that where, by the state Constitution and laws, the referendum was treated *as part of the legislative power*, the power as thus constituted *should be treated to be the state legislative power* for the purpose of creating congressional districts by law." *Id.* (emphasis added). The Court's repeated emphasis on the Ohio Constitution's grant of legislative authority to its citizens was not surplusage; indeed, "it was because of the authority of the state to determine *what should constitute its legislative process* that the validity of the requirement of the state Constitution of

Ohio, in its application to congressional elections, was sustained." *Smiley*, 285 U.S. at 372 (discussing *Hildebrant*) (emphasis added). Moreover, the redistricting plan at issue in *Hildebrant* had been passed by the state legislature to begin with. 241 U.S. at 566. The question was whether submitting that plan to a referendum placed it outside the Elections Clause. And the Court answered in the negative only because the state constitution made clear that the referendum process was "part of the legislative power." *Id.* at 568.

Likewise, in *Smiley v. Holm,* the Court focused on whether the gubernatorial veto was *part of the legislative process*, as defined by the state constitution. *See* 285 U.S. at 363 (under the Minnesota constitution, "[b]efore any bill passed by the Senate and House of Representatives 'becomes a law,' it must 'be presented to the governor of the state,' and if he returns it, within the time stated, without his approval, the bill may become a law provided it is reconsidered and thereupon passed by each house by a two-thirds vote.") (quoting Minnesota Constitution). Because the state constitution made clear that acts of the Minnesota Legislature are subject "to the veto of the Governor *as a part of the legislative process*," *id.* at 369 (emphasis added), it did not violate the Elections Clause to give effect to the gubernatorial veto provision in determining when a redistricting measure was valid. *See id.* 372-73 (nothing in the Elections Clause prevents "a state from providing that legislative action . . . shall be subject to the veto power").

Rather than address the stark differences between the makeup of Ohio's and Florida's legislative powers, Defendants ignore the "legislative power" distinction altogether and argue that "*Hildebrant* and *Smiley* firmly and expressly establish that constitutional amendments generated by initiative may validly limit state legislatures during the redistricting process." (Doc. 74 at 5.) This argument is directly contradicted by the Court's reasoning in *Hildebrant* and *Smiley*—which focused on whether the redistricting measures at issue were enacted *as part of the*

*legislative process.* Indeed, if Defendants were correct, the focus of the Court's analysis in *Hildebrant* and *Smiley* on whether the laws at issue were enacted *as part of the legislative process* would have been unnecessary to the Court's decision. If Defendants were correct, *Hildebrant* and *Smiley* could have simply announced that the Elections Clause gave authority to states generally—avoiding any discussion of whether the measures at issue were enacted as part of the legislative process. But instead, in both *Smiley* and *Hildebrant*, the Court carefully considered that issue, analyzed the constitutions of the particular states, and emphasized that the redistricting measures at issue *were* enacted as part of the legislative process.[3]

**B.**    **Because It Was Enacted Completely Outside The Legislative Process, Amendment Six Is Not Authorized By The Elections Clause.**

This case is completely different from *Smiley* and *Hildebrant* because the Florida constitution expressly declares that "[t]he legislative power of the state shall be vested in *a legislature of the State of Florida*, consisting of a senate composed of one senator elected from each senatorial district and a house of representatives composed of one member elected from each representative district." Art. III, § 1, Fla. Const. (emphasis added). Unlike the Ohio Constitution's treatment of its referendum process, the Florida constitution does not designate the initiative process "as *part of the legislative power*." 241 U.S. at 568. The Florida constitution designates the initiative process as completely *separate* from the legislative power.

_____

[3] *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008) is not to the contrary. The Secretary quotes a line from that decision saying states' Election Clause "power is matched by state control over the election process for state offices." (Doc. 72 at 9.) But that case did not involve the question whether a state law was authorized by the Elections Clause. Rather, it addressed a facial First Amendment challenge to a primary election regulation and did not turn at all on the Elections Clause. Moreover, the Court's decision in no way held that the Elections Clause allows any regulation of federal elections that could be imposed on state elections and in no way disturbed the Court's prior pronouncement that "the exercise of [Elections Clause authority] must be in accordance with the method which the state has prescribed for legislative enactments." *Smiley,* 285 U.S. at 367.

*Diaz-Balart, et al. v. Browning, et al.*
Case No. 10-23968-UNGARO

(Doc. 67 at 12); *see also In re Advisory Op. to Atty. Gen. ex rel. Limiting Cruel & Inhumane Confinement of Pigs*, 815 So. 2d 597, 601 (Fla. 2002) (Pariente, J., concurring) ("[S]ome of Florida's most crucial legal principles have evolved as a result of the initiative process. However, *the legislative power of the state is vested in the Legislature . . . .*") (emphasis added) (quoting *Advisory Op. to the Atty. Gen.—Limited Marine Net Fishing*, 620 So. 2d 997, 1000 (Fla. 1993)).

Florida's citizen initiative amendments are not afforded the same flexibility as ordinary legislation; they represent "singular changes in the functions of our governmental structure," *Fine v. Firestone*, 448 So. 2d 984, 988 (Fla. 1984), and they cannot be undone absent a supermajority vote of electors, Art. XI, § 5, Fla. Const.  "By transcending time and changing political mores, the constitution is a document that provides stability in the law and society's consensus on general, fundamental values.  Statutory law, on the other hand, provides a set of legal rules that are specific, easily amended, and adaptable to the political, economic, and social changes of our society."  *Advisory Opinion to Attorney Gen.—Limited Marine Net Fishing*, 620 So. 2d 997, 1000 (Fla. 1993) (McDonald, J., concurring).  Plainly, "some issues are better suited as legislatively enacted statutes than as constitutional amendments." *Id.*  The state constitution, however, places the authority for legislative enactments exclusively with the Legislature.

Some states, like Ohio, allow direct citizen participation in their state legislative process. Florida does not.  The powers of Florida's Legislature and of Florida's citizens represent not a shared legislative authority, but rather opposite ends of a "delicate symmetric balance of [the state] constitutional scheme." *Browning v. Fla. Hometown Democracy, Inc., PAC*, 29 So. 3d 1053, 1064-65 (Fla. 2010) (plurality opinion) (emphasis omitted) (quoting *State ex rel. Citizens Proposition for Tax Relief v. Firestone*, 386 So. 2d 561, 566 (Fla. 1980)).  The initiative process

was not created to allow citizens' direct participation in legislation; it "was adopted to bypass legislative and executive control and to provide the people of Florida a narrow but direct voice in amending their fundamental organic law." *Id.* at 1063.

The essential teaching of *Hildebrant* and *Smiley* is that regulations of congressional elections must be enacted through a state's legislative process, as that process is defined by the state constitution. Amendment Six is a regulation of congressional elections. It was not enacted through Florida's legislative process. Therefore, it is inconsistent with the Elections Clause.

## C.   The Analysis Is Not Impacted By "Ordinary Principles" of State Constitutional Law.

Defendants explore Florida's constitutional structure and proclaim Florida's constitution "the supreme law of the state." (*See, e.g.*, Doc. 74 at 2, 12.) But such generalities overlook the fact that states have no reserved powers to regulate federal elections and that "States may regulate the incidents of such elections . . . only within the exclusive delegation of power under the Elections Clause." *Cook v. Gralike*, 531 U.S. 510, 523 (2001). These generalities also get Defendants nowhere under *Smiley* and *Hildebrant*. The key question under those cases is not whether the Florida Constitution is supreme for purposes of state law; the question is whether, according to the Florida Constitution, Amendment Six was adopted as part of the legislative process. And far from supporting that conclusion, the Florida constitution explicitly refutes it. Unlike the referendum process involved in *Hildebrant*—which, under the Ohio constitution, was explicitly "treated as *part of the legislative process,*" 241 U.S. at 568—Florida's initiative process is a free-standing process, separate and apart from the legislative process. (Doc. 67 at 12.)

Regardless, the Florida Constitution's "supreme" status with respect to state law yields to the United States Constitution's ultimate supremacy. Thus, for example, Florida's authority in

\255036\8 - # 273358 v5

ratifying federal constitutional amendments is not subject to restrictions in the state constitution, notwithstanding its status as the "supreme law of the state."  Accordingly, in *Trombetta v. State of Florida*, 353 F. Supp. 575 (M.D. Fla. 1973) (three-judge court), the United States District Court invalidated Florida's constitutional provision purporting to restrict the Legislature's authority to ratify federal constitutional amendments.  *Id.* at 578.  Notwithstanding that "[t]he Florida Legislature is a creature of the Constitution that creates it," (Doc. 72 at 3), the Legislature's function in ratifying federal amendments "is a federal function derived from the federal Constitution; and it transcends any limitations sought to be imposed by the people of a state." *Trombetta*, 353 F. Supp. at 578 (quoting *Leser v. Garnett*, 258 U.S. 130, 136-37 (1922)).  The provision was not saved by the fact that "[a]ll political power is inherent in the people," Art. I, § 3, Fla. Const., a provision on which Defendants rely.  (*See* Doc. 71 at 3.)  Neither is Amendment Six saved by this provision.  The issue is whether Amendment Six was enacted through Florida's legislative process.  It was not, so it is not authorized by the Elections Clause.

### D.    <u>Amendment Six Does Not Constitute a Method of Legislative Enactment.</u>

Defendants also argue that Amendment Six is merely part of the legislative process, not unlike a gubernatorial veto.  Thus, the Secretary contends, "the Florida electorate changed the legislative process for congressional redistricting" by enacting Amendment Six.  (Doc. 71 at 5 (emphasis added); *accord id.* at 8 ("Amendment 6 itself establishes the legislative process . . . .").  But unlike a gubernatorial veto, Amendment Six itself regulates the manner of holding elections for Congress.  Defendants thus confuse the question of whether Amendment Six was authorized by the Elections Clause with the distinct question of what Amendment Six purports to do (if authorized).  *Hildebrant* and *Smiley* make clear that Amendment Six's validity turns on whether it was enacted as part of the legislative process, and not on whether Amendment Six (in operation) would impact the legislature.  And that conclusion is consistent with the text of the

Elections Clause, which places the focus on whether the election measure was "prescribed by the Legislature thereof," and not whether the measure has "an impact on the Legislature thereof."

Intervening Defendants argue that Amendment Six "is no different from other Florida constitutional limits on the Legislature." (Doc. 74 at 12.) They then go on to list "quorum requirements," "public-meeting and journal requirements," "a single-subject rule," "multiple reading and related requirements relevant to passage," "multiple session requirements," and "gubernatorial veto provisions."[4] But those generally applicable provisions would not trigger the Elections Clause in the first place because they are not regulations of the "Times, Places, and Manner" of federal elections. For that reason, Defendants miss the point when they argue that Plaintiffs' position is that the Florida Legislature "operates with complete immunity from any constraints that may be imposed under the state constitution." (Doc. 74 at 5.) Amendment Six applies to congressional redistricting *only*, so unlike those general procedures, which themselves form part of the legislative process, it must draw its authority from the Elections Clause.[5]

---

[4] Intervening Defendants also reference provisions they contend "limit the Legislature's discretion, even with respect to federal elections," including secret ballot rules and the equal-protection clause. As discussed in Section III, below, none of these "restrictions" is meaningful to the issues in this case.

[5] Moreover, those general requirements are truly procedural and—like the provisions in *Smiley* and *Hildebrant*—have general applicability. The governor of Minnesota or the people of Ohio could veto *any* law the legislature passed—a budget, a tax provision, a criminal law, or a congressional redistricting plan. *See Hildebrant*, 241 U.S. at 566 (referendum allowed people "to approve or disapprove by popular vote *any law* enacted by the general assembly") (emphasis added); *Smiley*, 285 U.S. at 363 (before "any bill" becomes a law, it must be presented to the governor). Amendment Six, on the other hand, applies to congressional redistricting *only*. Nothing in *Hildebrant* or *Smiley* suggests that a state could create an entirely separate "process" for congressional redistricting—even if Amendment Six established a "process." On the contrary, "*Smiley* indicates that congressional redistricting must be done by a state in the same manner that other legislative enactments are implemented." *Smith v. Clark*, 189 F. Supp. 2d 548, 553 (S.D. Miss. 2002) (three-judge court); *see also Smiley*, 285 U.S. at 373 (concluding that redistricting "shall be subject to the veto power of the Governor *as in other cases of the exercise of the lawmaking power*") (emphasis added); *Hildebrant*, 241 U.S. at 568 ("[T]he referendum was treated as part of *the* legislative power, the power as thus constituted should be held and

*Diaz-Balart, et al. v. Browning, et al.*
Case No. 10-23968-UNGARO

### E.      The Legislature's Remaining Role Does Not Salvage Amendment Six.

Defendants also argue that, regardless of any imposition Amendment Six causes, the Legislature still retains authority to draw the districts.  This argument is off the mark.  Amendment Six directly regulates the manner of conducting federal elections and therefore must draw its authority from the Elections Clause.  Because Amendment Six is not authorized by the Elections Clause, it is invalid.  The fact that the state could still redistrict *subject to Amendment Six* in no way legitimizes Amendment Six because (as explained above) the provision is invalid from the start.

Justice Joseph Story, who authored the preeminent early treatise on the United States Constitution, rejected the same argument Defendants present.  During the Massachusetts constitutional convention of 1820, there was a proposal that the state constitution limit the Legislature's congressional redistricting authority.[6]  Like Defendants here, some in Massachusetts protested that the Legislature would still draw the districts:  "We only propose to limit them in the exercise of their discretion.  Who can question the right of the people to instruct the Legislature in the manner of exercising their discretion"?  Journal of Debates and Proceedings in the Convention of Delegates Chosen to Revise the Constitution of Massachusetts, Reported for the Boston Daily Advertiser, New Edition (1853), at 107.[7]  Justice Story answered:

---

treated to be the state legislative power for the purpose of creating congressional districts by law.") (emphasis added).

[6] The proposal would have required the Massachusetts Legislature, in the first year after each Census, to create "convenient districts," each represented by no more than two members of Congress, and would have barred the Legislature from amending the redistricting plan until after the next Census.  *See* Journal of Debates and Proceedings in the Convention of Delegates Chosen to Revise the Constitution of Massachusetts, Reported for the Boston Daily Advertiser, New Edition (1853), at 104.

[7] Available at http://tinyurl.com/3j8m75u (last visited June 9, 2011).

\255036\8 - # 273358 v5

The question then was whether we have a right to insert in our constitution a provision which controls or destroys a discretion, which may be, nay which must be exercised by the Legislature, in virtue of powers confided to it by the [Elections Clause of the] constitution of the United States. . . . *Here an express provision was made for the manner of choosing representatives by the state legislatures. They have an unlimited discretion in the subject.* They may provide for an election in single districts, in districts sending more than one, or by a general ticket for the whole state. Here is a general discretion, a power of choice. What is the proposition on the table? *It is to limit this discretion, to leave no choice to the Legislature, to compel representatives to be chosen in districts. In other words, to compel them to be chosen in a specific manner—excluding all others.*

*Id.* at 109-110 (emphasis added). Thus, Justice Story concluded, the proposal was a "direct and palpable infringement" of the federal constitution, because it would have "assume[d] a control over the Legislature which the constitution of the United States does not justify." *Id.* at 110. Here too, the Legislature's remaining authority after Amendment Six cannot save Amendment Six.

Moreover, Defendants' argument completely undermines their primary position. If Defendants are correct that the Elections Clause's use of "by the Legislature thereof" delegates authority that states may exercise "through any means of lawmaking," (Doc. 74 at 2), then the Legislature's continued involvement (albeit limited) would be irrelevant. States could simply transfer their redistricting authority to the executive or to the courts through an initiative measure or other procedure removed from the legislative process—and they could cut the legislature entirely out of the process. Indeed, because the state constitution is the "supreme law of the state," under Defendants' theory, it could assign the congressional redistricting task to anyone.[8]

---

[8] The three-judge court in *Smith v. Clark*, a case on which Defendants rely, rejected this notion. 189 F. Supp. 2d 548 (S.D. Miss. 2002). *Smith* overruled a state-court-created congressional plan because the state court—despite courts' general ability to make law—had no "legislative authority to draw the state's congressional districts." *Id.* at 558. Because the Elections Clause "requires a state to adopt a congressional redistricting plan in a manner that comports with legislative authority as defined by state law," the plan was invalid. *Id.* at 556; *see also Libertarian Party of Ohio v. Brunner*, 567 F. Supp. 2d 1006, 1011 (S.D. Ohio 2008)

12

Defendants' theory leaves no meaning in the limiting words: "by the Legislature thereof."

## III. INTERVENING DEFENDANTS MISCHARACTERIZE PLAINTIFFS' ARGUMENT TO SUPPORT A PARADE OF HORRIBLES.

Intervening Defendants next attack an argument not made—that in establishing congressional districts, the Legislature is immune from *any* state constitutional provisions. Plaintiffs have not presented that argument and acknowledged that congressional redistricting has always been subject to gubernatorial veto—which is properly viewed as a part of the legislative process. (Doc. 67 at 4 (noting that Legislature effected congressional redistricting "pursuant to its ordinary legislative processes, which were subject to—among other things—a gubernatorial veto")). Undeniably, the Florida Legislature is subject to the generally applicable procedural provisions that relate to and form a part of the legislative process, which do not independently trigger the Elections Clause. But Amendment Six—which exclusively regulates federal elections—is a far cry from such generally applicable provisions.

After exaggerating Plaintiffs' position, Intervening Defendants then hypothesize the horrendous results of a judgment in Plaintiffs' favor. They contend that it would invalidate "the long-standing right under Art. VI, Sec. 1, of the Florida Constitution to be a write-in candidate for Congress" and would destroy other important constitutional guarantees. (Doc. 74 at 17.) The constitutional write-in provision, though, is consistent with the Election Code, which was

("Plaintiffs correctly contend that only the legislative branch has the authority, under Articles I and II of the United States Constitution, to prescribe the manner of electing candidates for federal office."); *Carstens v. Lamm*, 543 F. Supp. 68, 79 (D. Colo. 1982) ("Congressional redistricting is a law-making function subject to the state's constitutional *procedures*. . . . Both the Governor and the General Assembly are integral and indispensable parts of the *legislative process*.") (emphasis added); *Grills v. Branigin*, 284 F. Supp. 176, 180 (S.D. Ind. 1968) (three-judge panel) ("[The Elections Clause] clearly does not authorize the defendants, as members of the Election Board of Indiana, to create congressional districts. This power is granted to the Indiana General Assembly and the Election Board does *not possess the legislative power under the Indiana Constitution* . . . .") (emphasis added), *aff'd sub. nom.*, 391 U.S. 364 (1968). For the same reason, Amendment Six is invalid, notwithstanding the Legislature's remaining role.

enacted *by the Legislature. See* § 99.061(4)(a), Fla. Stat. (2010) (permitting qualification of write-in candidates). The same is true regarding secret-ballot and plurality-wins provisions. *Id.* §§ 101.041 (secret ballot); 100.181 (plurality required for win). Thus, there is no conflict—even if those issues were before the Court.[9] Nor would this Court's decision impact the "state constitutional guarantees of equal protection [or] due process." (Doc. 74 at 17.) Those state rights are coterminous with their federal counterparts, *see Modern, Inc. v. Fla., Dep't of Transp.*, 381 F. Supp. 2d 1331, 1346 n.26 (M.D. Fla. 2004) ("Under the Florida Constitution, the equal protection and due process standards are the same as the federal standards."); *Duncan v. Moore*, 754 So. 2d 708, 712 (Fla. 2000) (adjudicating state and federal equal protection and due process claims together), and it is well established that the Elections Clause does not grant states authority to violate other federal constitutional rights, *see, e.g., Tashijan v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986).[10]

Last, Intervening Defendants ask this Court to consider the effects its decision would have on other states, complaining that Plaintiffs' requested relief "would decimate state constitutional law" in many states. (Doc. 74 at 16 n.7.) But that argument is overblown. Plaintiffs' position follows directly from the Supreme Court's pronouncements on the meaning of the Election Clause going back for nearly a century.[11] Moreover, each state law provision that

---

[9] Intervening Defendants cite *Smith v. Smathers*, 372 So. 2d 427 (Fla. 1979), which held invalid a legislative regulation relating to write-in candidacies. The Elections Clause issue was not raised in that case, which has no bearing here.

[10] The basis for Intervening Defendants' complaining that Plaintiffs' argument would invalidate public records laws (Doc. 74 at 17) is unclear. The public records provisions do not limit the Legislature's authority to enact laws (other than those related to public records), and those do not seem to be at issue here.

[11] Additionally, Defendants cite no legal authority for the proposition that this Court should ignore the requirements of the United States Constitution to avoid "upend[ing] established practices nationwide." (Doc. 74 at 16.) And there is none. As the Supreme Court recognized in *Smiley*, "[g]eneral acquiescence cannot justify departure from the law." 285 U.S.

Defendants invoke must be analyzed separately to determine whether they regulate the times, places, or manner of federal elections and whether they were enacted as part of the legislative process, as defined by the constitutions of those states.  And it is by no means the case that Plaintiffs' position would result in the categorical invalidation of such laws.

In New Jersey, for example, the *state legislature* created a redistricting commission.  *See Brady v. N.J. Redistricting Comm'n*, 622 A.2d 843 (N.J. 1992).  The New Jersey Supreme Court rejected an Elections Clause challenge to the commission, noting that New Jersey's Constitution permitted such delegations of *legislative authority*.  *Id.* at 850.  But there, both houses of the New Jersey legislature and the governor had approved the delegation of authority; there was no "'end run' around a required participant in the lawmaking process."  *Id.* at 851.  Later, New Jersey amended its constitution to permanently create a redistricting commission, but that amendment was proposed by the legislature and, again, was not an "end run" around the legislative process.  *See* N.J. Const. Art. II, § 2; *cf. Smith*, 189 F. Supp. 2d at 553 ("[T]here must be some delegation of legislative authority, delegated by a legislative enactment of some sort, to draw congressional districts.").  The validity of that constitutional provision would thus face a different analysis than Amendment Six and—at any rate—is not before this Court.[12]

In addition to differing *processes*, states have varying redistricting *standards,* which would have to be separately considered.  For example, Article 3, Section 5 of the Connecticut Constitution—which is among the state provisions Intervening Defendants claim will be "decimated," (Doc. 74 at 16 & n.7, 17 n.8)—requires only that "[t]he establishment of

---

at 369; *accord United States v. Comstock*, 130 S. Ct. 1949, 1958 (2010) ("We recognize that even a longstanding history of related federal action does not demonstrate a statute's constitutionality.").

[12] To be clear, although the question is not presented here, Plaintiffs' position would not require the invalidation of an independent commission acting with legislative authority validly delegated by a state legislature to redistrict.  (*See* Doc. 74 at 16.)

congressional districts and of districts in the general assembly shall be consistent with federal constitutional standards."  Conn. Const. Art. 3, § 5.  Unlike Amendment Six, that provision was not enacted through a process that bypassed the legislature; the Connecticut legislature actually proposed the amendment.[13]  Regardless, that "standard" hardly restricts legislative authority, which is, of course, already governed by "federal constitutional standards."  Defendants are therefore quite wrong in suggesting that Plaintiffs' position would invalidate "*every* state constitutional provision placing limitations on the legislature's authority to draw congressional districts" or even necessarily "those [constitutional] provisions that were created by initiative." (Doc. 74 at 17.)

Furthermore, to the extent Defendants hope to rely on other states' practices, it is noteworthy that many state constitutions have long imposed standards on state legislative—but not federal congressional—redistricting, further highlighting that the two are not identical.  If there is any relevant state practice that bears on the question presented, it should be that one.[14]

Intervening Defendants also misstate plaintiff's position as being that "the voters of

---

[13] *See* Conn. H.J.R. 3 (1980) (amending section to reference congressional districts).

[14] Until Amendment Six became effective, Florida was among these states.  Florida's Constitution has long included standards for state legislative redistricting.  *See* Fla. Const. Art. III, § 16(a); *In re Apportionment Law*, 414 So. 2d 1040, 1051 (Fla. 1982).  States whose constitutions dictate legislative—but not congressional—redistricting standards are numerous. *See, e.g.*, Ala. Const. art. IX, §§ 198-200; Alaska Const. art. VI, § 6; Ga. Const. art. III, § II; Ind. Const. art. 4, § 5; Md. Const. art. III, § 4; Mich. Const. art. IV, §§ 2-3; Minn. Const. art. IV, §§ 2-3; Neb. Const. art. III, § 5; N.H. Const. Pt. II, arts. 9,11, 11-a; N.Y. Const. art. III, §§ 4-5; N.C. Const. art. II, §§ 3, 5; N.D. Const. art. IV, § 2; Ohio Const. art. XI, §§ 3-11; Okla. Const. art. 5, §§ 9A, 10A; Or. Const. art. IV, § 7; Pa. Const. art. II, § 16; R.I. Const. art. VII, § 1; S.D. Const. art. III, § 5; Tex. Const. art. III, §§ 25-26; Vt. Const. chap. II, §§ 13, 18; Wis. Const. art. IV, §§ 3-5.  Moreover, in the context of the country's history, the redistricting commissions Defendants cite are a recent development.  *See, e.g.*, Cal. Const. Art. 21 §§ 1, 2 (adopted 2008); Ariz. Const. Art. 4 Pt. 2 § 1 (adopted 2000); N.J. Const. art. II, § 2 (adopted 1995).  A more historical view reveals that "the uniform practice . . . has been to provide for congressional districts by the enactment of statutes with the participation of the Governor wherever the state Constitution provided for such participation *as part of the process of making laws*."  *Smiley*, 285 U.S. at 370 (emphasis added).

Florida cannot place constitutional limits on the Legislature's ability to draw districts."  (Doc. 74 at 10.)  Again, they are incorrect.  The voters of Florida have every right to determine how federal districts are drawn.  But the way the United States Constitution calls for the voters to exercise that authority is *through the legislative process*, *i.e.*, through their representatives— hardly a novel or undesirable form of democratic action.  And, in any event, it is the way the Framers determined to be the most appropriate for state laws governing federal elections.

## IV.  AMENDMENT SIX IS NOT AN APPROPRIATE REGULATION OF THE TIME, PLACE, OR MANNER OF FEDERAL ELECTIONS.

Even if Amendment Six had been enacted through Florida's constitutionally recognized legislative process, it would be invalid because it is not an appropriate regulation of the manner of federal elections.  Defendants cite no case holding anything *close* to Amendment Six's requirements as such an appropriate regulation.  "The Framers intended the Elections Clause to grant States authority to create *procedural regulations*, not to provide States with license to exclude classes of candidates from federal office."  *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832-33 (1995) (emphasis added).

Therefore, in *Cook v. Gralike*, 531 U.S. 510 (2000), the Court invalidated a state law requiring certain disclosures on ballots.  The state argued there—like Defendants do here—that the provision merely regulated the manner of elections and was a valid exercise of Elections-Clause power.  *Id.* at 523.  The Court rejected that argument for a simple reason:  The challenged provision "[was] not a procedural regulation.  It [did] not regulate the time of elections; it [did] not regulate the place of elections; nor, we believe, [did] it regulate the manner of elections."  *Id.* The regulation was not related to the "manner" of elections, "for in our commonsense view that term encompasses matters like 'notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers,

and making and publication of election returns.'" *Id.* at 523-24 (quoting *Smiley*, 285 U.S. at 366). This is no less true for Amendment Six, which is likewise no mere "procedural" regulation.

As Intervening Defendants effectively concede, the Amendment's purpose is to keep incumbents from winning. They claim "voters were responding to evidence indicating that for decades . . . legislators had repeatedly configured districts to favor themselves." (Doc. 74 at 1.) Thus, it logically follows, voters wanted districts drawn to not favor those legislators. Further, Intervening Defendants accuse Plaintiff Congresspersons of feeling "threatened" that their districts will not favor them. (*Id.* at 2.) This accusation betrays Amendment Six's obvious purpose: to exalt candidates who would otherwise lose and to vanquish candidates who would otherwise win.[15] These are precisely the types of outcome-determinative provisions the Supreme Court has found inconsistent with the Elections Clause. *See Cook*, 531 U.S. at 526 (invalidating state balloting provision designed to affect electoral outcomes). Just as the provision in *Cook* was to make the process "fairer" by reducing the likelihood of victory for candidates who exceeded the desired term limits, Amendment Six purports to make the process "fairer" by reducing the likelihood that incumbents will win reelection. "Such 'regulation' of congressional elections simply is not authorized by the Elections Clause." *Id.*[16]

---

[15] The Amendment's sponsor candidly laments "that over the last decade only a small fraction of legislative incumbents have been defeated." *See* FairDistrictsNow, available at http://fairdistrictsnow.org/mission/ (last visited June 9, 2011). Amendment Six's purpose, then, is to increase the number of incumbent defeats—an impermissible purpose.

[16] Defendants' views of Amendment Six's virtues warrant no consideration. Even if Defendants were correct that the standards were "traditional principles" that are "mild" and "universally accepted," (Doc. 72 at 17-18; Doc. 74 at 15), it does not follow that the Elections Clause permits them. The question is whether Amendment Six is "among the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved, ensuring that elections are fair and honest and that some

*Diaz-Balart, et al. v. Browning, et al.*
Case No. 10-23968-UNGARO

## CONCLUSION

Because Amendment Six was enacted wholly outside of the state legislative process, and

because it imposes requirements that go beyond simply regulating the "manner" of holding

congressional elections, the Court should declare that it is invalid and grant judgment in

Plaintiffs' favor.

| | |
|---|---|
| /s/ *Stephen M. Cody* | /s/ *Allen Winsor* |
| Stephen M. Cody | George N. Meros, Jr. |
| Fla. Bar No. 334685 | Fla. Bar No. 263321 |
| 16610 SW 82 Court | Allen Winsor |
| Palmetto Bay, Florida 33157 | Fla. Bar No. 016295 |
| (305) 753-2250 | GRAYROBINSON PA |
| Fax (305) 468-6421 | Post Office Box 11189 |
| stcody@stephencody.com | Tallahassee, FL 32302 |
| *Attorneys for Plaintiffs Corrine Brown and* | (850) 577-9090 |
| *Mario Diaz-Balart* | Fax (850) 577-3311 |
| | gmeros@gray-robinson.com |
| | awinsor@gray-robinson.com |
| | - *and-* |
| | Miguel De Grandy |
| | Florida Bar No. 332331 |
| | 800 Douglas Road, Suite 850 |
| | Coral Gables, Florida 33134 |
| | (305) 444-7737 |
| | Fax (850) 443-2616 |
| | mad@degrandylaw.com |
| | *Attorneys for Intervening Plaintiff, Florida* |
| | *House of Representatives* |

---

sort of order, rather than chaos, is to accompany the democratic process." *Cook*, 531 U.S. at 524
(marks and citation omitted). It is not.

\255036\8 - # 273358 v5

*Diaz-Balart, et al. v. Browning, et al.*
Case No. 10-23968-UNGARO

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was electronically served through the Court's CM/ECF system, unless otherwise noted, this ninth day of June, 2011 to the following:

Harry Thomas
Radey Thomas Yon and Clark
301 South Bronough Street
Suite200
Tallahassee, Florida  32301
Phone:  850-425-6654
Email:  hthomas@radeylaw.com
*Attorneys for the Florida Secretary of State*

Michael B. DeSanctis
Paul M. Smith
Jenner & Block, LLP
1099 New York Avenue, NW
Washington, DC 20001
Phone:  202-639-6000
Email: eharen@jenner.com
*Attorneys for Intervenors Leon Russell,*
*Patricia T Spencer, Carolyn H Collins, Edwin*
*Enciso, Stephen Easdale, Florida State*
*Conference of NAACP Branches and*
*Democracia Ahor*a

J. Gerald Hebert
191 Somervelle Street, #405
Alexandria, VA 22304
Phone:  703-628-4673
Fax:  567-5876
Email: GHebert@campaignlegalcenter.org
*Attorneys for Intervenors Leon Russell,*
*Patricia T Spencer, Carolyn H Collins, Edwin*
*Enciso, Stephen Easdale, Florida State*
*Conference of NAACP Branches and*
*Democracia Ahor*a

Robert M. Norway
Boies, Schiller & Flexner LLP
121 South Orange Ave., Suite 840
Orlando, FL  32801
Phone:  407 792 1294
Email:  rnorway@bsfllp.com
*Attorneys for Janet Cruz, Arthenia L. Joyner,*
*Luis R. Garcia, Joseph A. Gibbons and Perry*
*E. Thurston*

Stephen Frederick Rosenthal
Podhurst Orseck Josefsberg et al
City National Bank Building
25 W Flagler Street
Suite 800
Miami, FL 33130-1780
Phone:  305-358-2800
Fax:  305-358-2382
Email: srosenthal@podhurst.com
*Attorneys for Intervenors Leon Russell,*
*Patricia T Spencer, Carolyn H Collins, Edwin*
*Enciso, Stephen Easdale, Florida State*
*Conference of NAACP Branches and*
*Democracia Ahor*a

Jon L. Mills
Boies, Schiller, and Flexner, LLP
100 S.E. Second Street
Suite 2800
Miami, FL 33131
Phone  305-539-8400
Email: jmills@bsfllp.com
*Attorneys for Janet Cruz, Arthenia L. Joyner,*
*Luis R. Garcia, Joseph A. Gibbons and Perry*
*E. Thurston*

\255036\8 - # 273358 v5

*Diaz-Balart, et al. v. Browning, et al.*
Case No. 10-23968-UNGARO

Carl Edward Goldfarb
Boies Schiller & Flexner
401 E Las Olas Boulevard
Suite 1200
Fort Lauderdale, FL 33301
Phone:  954-356-0011
Fax:  356-0022
Email: cgoldfarb@bsfllp.com
*Attorneys for Janet Cruz, Arthenia L. Joyner,*
*Luis R. Garcia, Joseph A. Gibbons and Perry*
*E. Thurston*

Stuart H. Singer
Boies, Schiller & Flexner LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, FL  33301
Phone:  954-356-0011
Email:  ssinger@bsfllp.com
*Attorneys for Janet Cruz, Arthenia L. Joyner,*
*Luis R. Garcia, Joseph A. Gibbons and Perry*
*E. Thurston*

Joseph W. Hatchett
Akerman Senterfitt
106 East College Avenue
12th Floor
Tallahassee, FL  32301
Tel:  850.224.9634
Fax:  850.222.0103
Email joseph.hatchett@akerman.com
*Attorneys for Janet Cruz, Arthenia L. Joyner,*
*Luis R. Garcia, Joseph A. Gibbons and Perry*
*E. Thurston*

/s/  *Allen Winsor*
Allen Winsor

\255036\8 - # 273358 v5