## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.: 10-23968-CIV-UNGARO

MARIO DIAZ-BALART and
CORRINE BROWN,

     Plaintiffs,

v.

KURT BROWNING,

     Defendant,

     and

FLORIDA STATE CONFERENCE OF
NAACP BRANCHES; DEMOCRACIA
AHORA; LEON W. RUSSELL,
PARTICIA T. SPENCER; CAROLYN H,
COLLINS, EDWIN ENCISO,
STEPHEN EASDALE; THE AMERICAN
CIVIL LIBERTIES UNION OF FLORIDA;
HOWARD SIMON, BENETTA M.
STANDLY, SUSAN WATSON, JOYCE
HAMILTON HENRY; JANET CRUZ;
ARTHENIA JOYNER; LUIS R. GARCIA;
JOSEPH A. GIBBONS; PERRY E.
THURSTON,

     Defendant-Intervenors

_____/

## ORDER ON MOTION FOR SUMMARY JUDGMENT

     THIS CAUSE is before the Court upon the Joint Motion for Summary

Judgment of Plaintiffs and Plaintiff-Intervenor ("Pl. Mot. Summ. J.") Apr. 25, 2011,

1

ECF. No. 67, Defendant Secretary's Cross Motion for Summary Judgment ("Def. Sec.'s Cx. Mot. Summ. J.") May 25, 2011, ECF No. 72, and Defendant-Intervenors' Cross Motion for Summary Judgment ("Def. Intv. Cx. Mot. Summ. J."), May 25, 2011, ECF No. 72.   The Court has considered the Motions and pertinent portions of the record, including the responses, replies, and oral argument,  and is otherwise fully advised in the premises.

## I. Factual Background

### A.  Parties

Plaintiff Mario Diaz-Balart represents Congressional District 21 in the U.S. House of Representatives.  Pl. Statement of Undisputed Material Facts 2, Apr. 25, 2011, ECF No. 68. Plaintiff Corrine Brown represents Congressional District 3 in the U.S. House of Representatives.  *Id.* 2.   Plaintiff-intervenor is the Florida House of Representatives, which together with the Florida Senate comprises the legislature of the state of Florida.  *Id.* 2.

Defendant Kurt. S. Browning, the Secretary of State of Florida, is the chief elections officer of the State.  *Id.* 2, *see also* Def. Sec. Statement of Uncontested Material Facts, May 26, 2011, ECF No. 73.  Leon W. Russell, Patricia T. Spencer, Carolyn H. Collins represent defendant-intervenor the Florida State Conference of NAACP Branches.  Def. Mot. Intervene 1, Jan. 6, 2011, ECF No. 19.   Edwin Enciso and Stephen Easdale represent defendant-intervenor Democracia Ahora.  *Id.* 1. Howard Simon, Benetta M. Standly, Susan Watson, and Joyce Hamilton Henry represent defendant-intervenor the American Civil Liberties Union of Florida

2

("ACLU-FL").   Def. Mot. Intervene 1, Dec. 16, 2010, ECF No. 11.    Defendant-intervenors Senator Arthenia L. Joyner, Representative Janet Cruz, Representative Luis R. Garcia, Jr., Representative Joseph A. Gibbons, and Representative Perry E. Thurston, Jr., are members of the Florida Legislature.  Def. Mot. Intervene 1, Mar. 1, 2011, ECF No. 45.

## II.  Syllabus

This case presents one question: does amendment VI to the Florida Constitution violate art. I, §4, cl. 1 ("the Elections Clause[1]") of the U.S. Constitution?

Under the Florida Constitution, voters have "[t]he power to propose the revision or amendment of any portion or portions of [the] constitution." Fla. Const. art. XI, §3.  Once a sponsor obtains sufficient petition signatures, its proposed amendment is submitted to a vote. *Id.* art. XI, §5.

On September 28, 2007, the Division of Elections of Florida's Department of State approved an initiative petition prepared by FairDistrictsFlorida.org.  The petition was then circulated.  It asked voters to "add a new section 20 to Article III." FairDistrictsFlorida.org, Serial No. 07-15, Constitutional Amendment Petition Form (2007).    Article III of the Florida Constitution addresses the Florida

---

[1]The Elections Clause provides that: "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter Such Regulations, except as to the Places of chusing Senators."

3

Legislature.  At the time of the petition, art. III contained 19 sections, setting forth the composition, procedures, and powers of the state legislature.  The petition proposed the following text as the new §20:

> Section 20. STANDARDS FOR ESTABLISHING CONGRESSIONAL DISTRICT BOUNDARIES
> In establishing congressional district boundaries:
>
> (1) No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice; and districts shall consist of contiguous territory.
>
> (2) Unless compliance with the standards in this subsection conflicts with the standards in subsection (1) or with federal law, districts shall be as nearly equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries.
>
> (3) The order in which the standards within subsections (1) and (2) of this section are set forth shall not be read to establish any priority of one standard over the other within that subsection.

*Id.*

The petition was certified for placement on the November 2010 general election ballot.  There the petition appeared under the heading "No. 6 CONSTITUTIONAL AMENDMENT ARTICLE III, SECTION 20 Standards for Legislature to Follow in Congressional Redistricting."  Miami-Dade Cnty. Elections Dep't., Sample Ballot GE. indd. Official Sample Ballot General Election Tuesday, Nov. 2, 2010 6 (2010).

Amendment VI prevailed, and, as contemplated, became art. III, §20 of the

4

Florida Constitution.  The text of art. III, §20, has not changed since the election.[2]

Under the Elections Clause of the U.S. Constitution, the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, §4, cl.1.  The Supreme Court has interpreted the Elections Clause to include Congressional redistricting. *Lance v. Coffman*, 549 U.S., 437 (2007); *Smiley v. Holm*, 285 U.S. 355 (1932); *Davis v. Hildebrant*, 241 U.S. 565 (1916).

Plaintiffs and plaintiff-intervenors argue that amendment VI is unconstitutional because it interferes with the Florida Legislature's authority under the Elections Clause.   Defendants and defendant-intervenors argue that amendment VI is constitutional.

### III.  Summary Judgment Standard

Summary judgment is authorized under Fed. R. Civ. P. 56 only when the moving party meets its burden of demonstrating that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  When determining whether the moving party has met this burden, the court must view the evidence and all factual inferences in the light most favorable to the non-moving party.   *Adickes v. S.H.*

---

[2]Whereas the petition used numbers in parentheses to separate the initiative's various sections, the Florida Constitution uses letters in parentheses.   The initiative has been reformatted accordingly.

*Kress & Co.*, 398 U.S. 144, 157 (1970); *Rojas v. Florida*, 285 F.3d 1339, 1341-42 (11th Cir. 2002).

Here, both sides agree that no genuine issue of material fact exists, and both claim to be entitled to judgment as a matter of law.

## IV. Legal Analysis

### A. Justiciability

Before addressing the legal question at issue, the district court must determine its authority to hear the case. It is not enough that plaintiffs allege a federal constitutional violation. In its seminal pronouncement on the limits of federal jurisdiction, the Supreme Court stated: "We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large— does not state an Article III case or controversy." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-1 (1992).

One of the components of the case-or-controversy requirement is standing, which is met when the plaintiff demonstrates an injury-in-fact, causation, and redressability. Here, plaintiffs and plaintiff-intervenor rely on their respective public offices to satisfy the Article III standing requirement. Congressman Diaz-Balart and Congresswoman Brown are both members of the U.S. House of Representatives, and both intend to run for Congress in 2012. Pl. Statement of Undisputed Material Facts 2. The Florida House of Representatives has also

intervened as a plaintiff, claiming that the amendment has unconstitutionally constrained its "plenary and exclusive authority" to redistrict.  Proposed Intervenor Compl. 1, Jan. 14, 2011, ECF No. 34.

Both plaintiffs, as well as the plaintiff-intervenor, have Article III standing. Each has a "particularized" and "concrete" injury that goes beyond the generalized harm to the public resulting from a constitutional breach.  If amendment VI is upheld, the members of the Florida House must abide by the amendment's provisions when engaged in congressional redistricting.  Similarly, as members of Congress, plaintiffs Diaz-Balart and Brown stand to incur a particularized harm should their districts be redrawn as a result of an unconstitutional redistricting process.  Finally, as further required by standing doctrine, the linkage between the injury to all plaintiffs in the performance of their public office and the contested Amendment is "fairly traceable," and the requested relief–namely, striking down the Amendment–is likely to remove the cause of the harms asserted by the complainants. *See United States v. Hays*, 515 U.S. 737, 743 (1995).[3]

Ripeness and the political question doctrine are the remaining jurisdictional

---

[3]In *Raines v. Byrd*, 521 U.S. 812 (1997), the Supreme Court ruled that members of Congress lacked standing in a suit challenging the President's use of the line-item veto. The Court emphasized that the Congressmen did not show that the line-item veto caused a particularized harm to them. "[T]hey have not alleged that they voted for a specific bill, that there were sufficient votes to pass the bill, and that the bill was nonetheless deemed defeated." *Id*. at 824. In *Raines*, the Court noted that the line-item veto did not automatically affect the Congressmen. This is not the case with respect to the Florida legislators, who must abide by amendment VI during the next round of Congressional redistricting.  Likewise, plaintiffs Diaz-Balart and Brown must also face the consequences of amendment VI since the amendment regulates the way in which Congressional districts in Florida will be drawn.

requirements applicable to this case.  Here, the alleged harm is sufficiently immediate to satisfy the ripeness requirement.  Amendment VI is currently state law, and Florida has begun the redistricting process.  The political question doctrine, which provides the federal courts with prudential guidelines for allowing certain constitutional controversies to be resolved by the political branches, did not prevent the Supreme Court from ruling on alleged violations to the Elections Clause in *Smiley, supra*; thus, it does not bar the district court here from proceeding to the merits.

The case is therefore justiciable and the district court may proceed to the constitutional arguments.

### B. The Elections Clause

Both sides agree that the case turns on the Elections Clause, and both make passing references to the intent of the Framers.  Yet absent in the briefs of both sides is any true attempt to analyze the origins of the Elections Clause.  It is as if the proceedings of the Constitutional Convention, the state ratification debates, and the First Congress lay somehow beyond the reach of these litigants.

The Constitutional Convention clarifies what really mattered to the Framers when determining where to assign the power of regulating Congressional elections.  Immediately after taking up the Elections Clause, the delegates divided it into two parts.  The first part, which authorized the "Legislatures of each State" to set the times, places, and manner of Congressional elections, was agreed to unanimously. 2 Farrand, Records of the Federal Convention of 1787 240-2.

Next, Charles Pinckney and John Rutledge, both of South Carolina, objected to the remaining part, which reserved to Congress the power to intervene, insisting that the states have plenary power over Congressional elections.  Several speeches ensued in favor of Congress's supervisory authority, including one by James Madison who reminded the delegates that the need for a federal government was itself proof  "that the State Legislatures will sometimes fail or refuse to consult the common interest." The delegates rejected the South Carolinians' motion against Congressional supervision, and adopted the second part of the Elections Clause.  *Id.*

The debate over the Elections Clause continued during ratification in numerous states.   As had been the case at the Convention, the controversy centered on whether Congress should have a supervisory role over the regulation Congressional elections.   Neither side in the debate over the Elections Clause addressed where the power over Congressional elections was located within the state governments.   Nor did any participant in the debate seek to define more precisely the constitutional requirements that the states had to follow in setting the "Times, Places, and Manner" of Congressional elections.  Assuming bicameral legislatures, would majority votes by both chambers of a state's legislatures be needed?  Could a state governor with veto power overrule the legislature's vote?  Would the state's electorate have any role in the process? These were simply not issues at the time.

To supporters of the Elections Clause, the only argument worth having was over Congressional supervision.   Without it, they argued, the federal government

would cease to be.  "Nothing can be more evident," wrote Alexander Hamilton, "than that an exclusive power of regulating elections for the National Government, in the hands of the State Legislatures, would leave the existence of the Union entirely at their mercy.  They could at any moment annihilate it, by neglecting to provide for the choice of persons to administer its affairs."  The Federalist No. 59. John Jay defended Congress's role on identical grounds.  "Suppose that, by design or accident, the states should neglect to appoint representatives; certainly there should be come constitutional remedy for this evil."  2 Elliot, The Debates in the Several State Conventions 325. At Virginia's ratification convention, Madison made the same point after emphasizing the measured quality of the Elections Clause.  "It was found impossible to fix the time, place, and manner, of the election of representatives, in the Constitution.  It was found necessary to leave the regulation of these, in the first place, to the state governments, as being best acquainted with the situation of the people, subject to the control of the general government, in order to enable it be produce uniformity, and prevent its own dissolution." 3 Elliot 367.

Opponents of the Elections Clause, for their part, also directed their ire at Congress's supervisory role over the regulation of Congressional elections.  As with the clause's supporters, the precise contours of the power belonging to the state legislatures meant little to them.  The critical issue was the power of the states and their people against the specter of a federal leviathan.  "By section 4, article 1, the Congress are (*sic*) authorized, at any time, by law, to make, or alter, regulations respecting the time, place, and manner of holding elections for senators and

representatives, except as to the places of choosing senators," wrote the Anti-Federalist Brutus.  "By this clause the right of election, is, in a great measure, transferred from the people to their rulers." 2 Storing, The Complete Anti-Federalist 9.51.

At the First Congress, opponents of the Elections Clause made a final attempt to limit Congress's supervisory role.   Aedanus Burke of South Carolina sought, unsuccessfully, to include an amendment to the Elections Clause as part of what would become the Bill of Rights.   Burke's proposed amendment read: "Congress shall not alter, modify, or interfere in the times, places, or manner of holding elections of Senators, or Representatives, except when any State shall refuse or neglect, or be unable, by invasion or rebellion, to make such election." 1 Annals of Congress 768.

The focus of the amendment was, once again, on the extent of Congress's power as related to the states.   Whereas the Elections Clause itself mentioned the "Legislatures of the States," the amendment referred simply to "any State."  This is not a mere anomaly when considering that the original battle lines over the Elections Clause were drawn over the division of power between the federal and state governments, not over the division of power within the state governments.

### C. *Hildebrant* and *Smiley*

Until *Davis v. Hildebrant*, *supra*, the Supreme Court did not address the meaning of "State Legislature" in the Elections Clause.  Prior to *Hildebrant*, only Supreme Court Justice Joseph Story had offered an opinion– and that was his

personal opinion.  Speaking as a "citizen and delegate" at Massachusetts's 1820 constitutional convention, Justice Story objected to a proposal to limit the Massachusetts legislature's Elections Clause powers through a state constitutional amendment.  He believed state lawmakers had "unlimited discretion" under the Elections Clause.  Journal of Debates and Proceedings in the Convention of Delegates Chosen to Revise the Constitution of Massachusetts (1853), at 109-10.

Contrary to Justice Story's view, the Supreme Court in *Hildebrant* ruled that the discretion of state lawmakers under the Elections Clause could be constrained. The issue in the case was whether a state legislature's Elections Clause powers could be affected by a popular referendum.  In 1915, Ohio's legislature had passed a redistricting act.  After the governor signed the act and delivered it to the secretary of state, the people of Ohio, acting under a provision in the state constitution, voted down the law.  The Court in *Hildebrant* summarily rejected the Elections Clause challenge to the referendum vote, calling it "plainly without substance." 241 U.S. at 569.

In *Smiley*, the Supreme Court elaborated on whether "the conditions which attach to the making of state laws" apply when state legislatures are redrawing Congressional districts.  285 U.S. at 365.  At issue in *Smiley* was whether the provision in Minnesota's constitution requiring the governor's signature for legislation to become law applied to redistricting legislation.  As in *Hildebrant,* the Court upheld the limitation on the state legislature's Elections Clause power.

The Court in *Smiley* explained that whether a state could limit a legislature's

power to act under a power granted by the federal Constitution depended upon the nature of the power granted.   The Constitution allocates various responsibilities to the state legislatures.   But the Framers did not intend to grant state legislatures the same degree of authority in discharging each duty.  "The use in the Federal Constitution," noted the Court, "of the same term in different relations does not always imply the performance of the same function.  The legislature may act as an electoral body, as in the choice of United States Senators under Article 1, section 3, prior to the adoption of the Seventeenth Amendment.  It may act as a ratifying body, as in the case of proposed amendments to the Constitution under Article V.  It may act as a consenting body, as in relation to the acquisition of lands by the United States under Article I, Section 8, paragraph 17. Whenever the term 'legislature' is used in the Constitution, it is necessary to consider the nature of the particular action in view." *Id.* at 365‑6.

The Court concluded that the lawmaking function was at issue in redistricting.  The Elections Clause authorized the state legislatures to "provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Id.* at 366.  Since the state legislatures were required to function as lawmakers, which is not the case when the state legislatures act as electing, ratifying, or consenting bodies, the Court held that state laws made under the Elections Clause "must be in accordance with

the method which the State has prescribed for legislative enactments." *Id.* at 367.

Finding "no suggestion in the federal constitutional provision of an attempt to

endow the legislature of the State with power to enact laws in any manner other

than that in which the constitution of the State has provided that laws shall be

enacted," the *Smiley* Court upheld the Minnesota requirement.  *Id.* at 368.

### D. Amendment VI

Plaintiffs and plaintiff-intervenor make three arguments against the

constitutionality of amendment VI: (1) it was enacted outside the legislative

process; (2) it is a substantive limitation on the power of the state legislature over

Congressional redistricting; and (3) it improperly regulates the "manner" of a

Congressional election.  The Court considers each argument in turn.

#### 1. *Enactment of Amendment VI*

Plaintiffs and plaintiff-intervenor argue that *Hildebrant* and *Smiley* stand for

the proposition that Congressional redistricting must occur through the legislative

process.  In upholding the gubernatorial veto in *Hildebrant*, they claim, "the Court

emphasized that the State's own constitution made clear that the gubernatorial

veto was '*part* of the legislative process.'" Pl. Mot. Summ. J. 9.  They emphasize that

the Court in *Smiley* stated that "the State had made 'the referendum in

establishing congressional districts . . . a part of the legislative process.'" *Id.* 10.

Plaintiffs and plaintiffs-intervenors then argue that amendment VI is

unconstitutional because  it was "enacted completely outside of the legislative

process." *Id.* 11.  In support of this argument, they note that art. III of the Florida

14

Constitution defines the legislative power while art. XI defines the citizen initiative power. *Id.* 11-12. Thus they conclude that "an amendment to the Constitution is not an exercise of the State's *legislative* authority" but "the result of a process that is wholly distinct from any such exercise." *Id.* 12. As evidence of the "the fundamental differences" between the two, plaintiffs and plaintiffs-intervenors remark that the legislative process involves "substantial debate, compromise, transparency, and citizen involvement" while the initiative process includes no official debate, and instead requires voters to rely "on a limited ballot title and summary" of the proposed amendment. *Id.* 13.

In response, defendant-Secretary of State argues that amendment VI is a part of the legislative process because the Florida Constitution grants the people "[t]he power to propose the revision or amendment of any portion or portions of [the State] Constitution." Fla. Const. art. XI, §3. "As such," defendant continues, "Florida citizens retain the power to alter and reshape the legislative power of the state and the processes by which legislative enactments become law." Def. Sec.'s Cx. Mot. Summ. J. 4. Relying on *Smiley*, defendant then argues that where the U.S. Constitution enlists state legislatures to perform ordinary lawmaking activities, as in redistricting, the legislature is subject to the state constitutional provisions that apply to the legislative process. Since citizen initiated restrictions upon the legislature are a part of Florida's legislative process, defendant concludes that amendment VI is constitutional under *Smiley*. *Id.* 6.

Plaintiffs' and plaintiff-intervenor's argument that amendment VI is

15

unconstitutional because the amendment was enacted outside of the legislative process misinterprets the case law.   In *Smiley,* the Court focused on whether "conditions which attach to the making of state laws" applied to Congressional redistricting.   285 U.S. at 365.   Here, amendment VI is such a condition.   It defines the scope of the legislature's authority by establishing standards for the legislature to follow in Congressional redistricting.

Furthermore, *Smiley* does not indicate that the ordinary legislative process must be the vehicle for attaching a condition to a state legislature's Elections Clause powers.   To the contrary, the Court noted in *Smiley* that the state constitutions of Massachusetts and New York at the time of the Elections Clause granted the governor veto power of state laws.   Moreover, the Massachusetts constitution, including the provision granting the governor veto power over state laws, was adopted through popular ratification, and not the ordinary legislative process.   1 John Vile, The Constitutional Convention of 1787: A Comprehensive Encyclopedia of America's Founding (2005), at 467.   Hence, the Court's conclusion that there was "no intimation, either in the debates in the Federal Convention or in contemporaneous exposition, of a purpose to exclude a similar restriction *imposed by state constitutions* upon state legislatures when exercising the lawmaking power."   285 U.S. at 369 (emphasis added).

In Florida, amendment VI did precisely this.   From the petition phase onward, amendment VI was contemplated as a constitutional restriction upon the Florida legislature.   The amendment was presented to voters as an addition to art.

III, the portion of the Florida Constitution that delineates the authority of the state legislature, and, once approved, became art. III, §20.

In sum, *Smiley* stands for the proposition that Congressional redistricting must be effected through the state legislative process.  It does not require that the state legislatures be the sole source of the conditions prescribing their Elections Clause powers.  Amendment VI is thus consistent with *Smiley*, and, moreover, with the original understanding of the Elections Clause, which both supporters and defenders viewed as a provision primarily concerned with federal-state relations, not with directing the states to follow a precise legislative procedure.

### 2. Amendment VI as a substantive limitation

Additionally, plaintiffs and plaintiff-intervenor claim that amendment VI is unconstitutional because the amendment imposes substantive rules on Congressional redistricting.  Pl. Mot. Summ. J. 10.  As the petitioners recognize, the veto provisions at issue in *Hildebrant* and *Smiley* did not prescribe conditions for the exercise of the legislature's redistricting power.  Indeed, the veto provisions had nothing to do with redistricting.  It only happened that they were used against redistricting laws in the instances that produced the two Supreme Court cases.

But *Smiley* nowhere indicated that a state could not attach substantive conditions to the legislature's redistricting power.  This silence is persuasive because the Court also affirmed in *Smiley* that the exercise of a state legislature's redistricting power "must be in accordance with the method that the State has prescribed for legislative enactments."

Here, the Florida Constitution prescribes that "[a]ll political power is inherent in the people," art. I, §1, and further provides the people with the "power to propose the revision or amendment of any portion or portions of [the state] Constitution." Fla. Const. art. XI, §3. The Florida Supreme Court has plainly held that "[t]he Legislature is but an instrumentality appointed by the Constitution of this state to exercise a part of its sovereign prerogatives, namely the lawmaking power." *State ex. rel. Cunningham v. Davis*, 123 Fla. 41, 61-2 (Fla. 1936).

In Florida, moreover, the state constitution authorizes the people to participate in the lawmaking process. Art. XI permits voters to attach new conditions to the exercise of the legislature's various powers. Once the people of Florida act to limit the legislature's options through a constitutional amendment, the new constitutional provision binds the legislature.[4]

Amendment VI does attach a series of substantive conditions to Florida legislature's redistricting power. But the question under *Smiley* is not whether a state has restricted its legislature's redistricting power retrospectively through a veto as in *Smiley* and *Hildebrant* or prospectively through the adoption of a constitutional provision limiting the legislature's discretion. *Smiley* holds that conditions of whatever type on a legislature's redistricting power are valid if "in

---

[4]The plaintiffs and plaintiff-intervenor did not challenge Amendment VI on the grounds that the Amendment violates art. IV, §4 of the U.S. Constitution, which provides that "[t]he United States shall guarantee to every State in this Union a Republican form of government." In *Hildebrant*, the Court refused to rule on whether the popular veto violated art. IV, § Sec. 4, citing "settled rule that the question ... presents no justiciable controversy, but involves the exercise by Congress of the authority vested in it by the Constitution." 241 U.S. at 569.

accordance with the method that the State has prescribed for legislative enactments."  Amendment VI does not supplant the Florida legislature.  Rather, it attaches a series of conditions, adopted in accordance with the state constitution, to eventual legislative action on redistricting.   Amendment VI  is thus consistent with *Smiley*.

### 3.  Amendment VI as inappropriate "manner" restriction

Finally, plaintiffs and plaintiff-intervenor claim that amendment VI is unconstitutional because it goes beyond regulating the "times, places, and manner" of Congressional elections.  Pl. Mot. Summ. J. 10.   Plaintiffs' and plaintiff-intervenor's argument here is that amendment VI's provisions themselves violate the Elections Clause.  In other words, plaintiffs and plaintiff-intervenor claim that not even a state legislature could constitutionally impose the conditions of amendment VI.

In support of this argument, plaintiffs and plaintiff-intervenor rely on *U.S. Term Limits v. Thornton*, 514 U.S. 779 (1995)  and *Cook v. Gralike,* 531 U.S. 510 (2001).   In *U.S. Term Limits*, the Supreme Court struck down a state constitutional amendment that prevented incumbent House and Senate candidates with more than three or two terms in office, respectively, from appearing on the ballots. "[T]he Framers understood the Elections Clause as a grant of authority to issue procedural regulations," explained the Court, "and not as a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints." 514 U.S. at 833-34.   Similarly, in *Cook v. Gralike*, the

Court invalidated a state law that required federal ballots to state whether the candidates supported the voters' view on term limits.  Quoting *U.S. Term Limits*, the Court expressed its disapproval of provisions that are "far from regulating the procedural mechanisms of elections," but "dictate electoral outcomes."  531 U.S. at 523.

Amendment VI, however, offers no indication of running afoul of *U.S. Term Limits* and *Cook* by dictating electoral outcomes or favoring or disfavoring Congressional candidates.   On its face, the amendment prohibits the legislature from intentionally favoring or disfavoring a political party or an incumbent, and from intentionally denying racial and language minorities an equal opportunity to participate in the electoral process.  It also requires that the districts be comprised of contiguous territory, and suggests that they be compact, equal in population, and drawn in accordance with existing political and geographical boundaries to the extent feasible.

Furthermore, plaintiffs and plaintiff-intervenor do not provide any evidence to support the claim that amendment VI would "dictate electoral outcomes." Instead, they claim that simply because the amendment is "no mere procedural or mechanical regulation" and that it would "impact the electoral outcomes," it violates the Elections Clause.  Pl. Mot. Summ. J. 19.

Plaintiffs' and plaintiff-intervenor's argument that the Elections Clause restricts the state legislatures to regulating the mechanics of Congressional elections again misses the longstanding understanding of the Constitutional text.

When Madison considered the Elections Clause at the Constitutional Convention, he noted that the power to set the "the times places & manner of holding elections" was "of great latitude," and included whether the electors "should be divided into districts or all meet at one place." 2 Farrand 240.

When reviewing the "great latitude" that the state legislatures have under the Elections Clause, moreover, the Supreme Court has looked ultimately to the fairness of the restriction in question, and not whether it is a "mechanical" or "substantive" provision. Thus the Court has emphasized "the States' interest in having orderly, fair, and honest elections," *U.S. Term Limits*, 514 U.S. at 833; sought "to assure that elections are operated equitably and efficiently," *Burdick v. Takuski*, 504 U.S. 428, 433 (1992); and recognized the need for "a substantial regulation of elections if they are to be fair and honest." *Storer v. Borwn*, 415 U.S. 724, 730 (1974).

Here, plaintiffs and plaintiff-intervenor have not demonstrated that the challenged provisions would be unfair. Further, unlike the provisions at issue in *U.S. Term Limits* and *Cook*, those in amendment VI do not appear to frustrate the electoral chances of particular candidates. Thus, plaintiffs' and plaintiff-intervenor's argument that amendment VI constitutes an improper "manner" regulation also fails.

## IV. Conclusion

There being no evidence of a genuine issue of material fact, judgment in favor

of the defendant and defendant-intervenors is appropriate as a matter of law.

Supreme Court case law, consistent with the original debate over the Elections

Clause, contradicts plaintiffs' and plaintiff-intervenor's various arguments that

amendment VI is unconstitutional,  and supports the defendant's and defendant

intervenors' claim that Amendment VI is a valid regulation of the legislative

process under the Elections Clause.

     For the foregoing reasons, it is hereby

     ORDERED AND ADJUDGED that Defendant's and Defendant-Intervenors'

Cross Motions for Summary Judgement are GRANTED.  Plaintiffs' and Plaintiff-

Intervenor's Joint Motion for Summary Judgment is DENIED.

     DONE AND ORDERED in Chambers at Miami, Florida, this 9th day of

September 2011.

_____

UNITED STATES DISTRICT JUDGE

Copies provided:
counsel of record

22